HARKNESS v HARKNESS

Docket No. 201378. Submitted September 3, 1997, at Grand Rapids. Decided January 30, 1998, at 9:05 A.M.

Gaby Harkness filed in the Ingham Circuit Court a petition under the Hague Convention on the Civil Aspects of International Child Abduction and the International Abduction Remedies Act (42 USC 11601 *et seq.*) seeking the return to Germany from Mason, Michigan, of children born to her and respondent James E. Harkness. The court, Michael G. Harrison, J., ordered that the children be returned to the petitioner's custody in Germany. The respondent and his parents, who were named as respondents to the petition, appealed.

The Court of Appeals *held*:

1. The Hague Convention was adopted by the signatory nations, among whom were Germany and the United States, to protect children from the harmful effects of their wrongful removal and retention and to establish procedures to ensure their prompt return to the country of their habitual residence.

2. The trial court did not err in concluding that the children were being wrongfully retained in the United States and should be returned to Germany pursuant to the Hague Convention. This conclusion was supported by findings based on a preponderance of the evidence that the children were habitual residents of Germany immediately before their retention in the United States, that the petitioner had custody rights over the children, and that she was exercising those custody rights at the time the children were retained in the United States.

Affirmed.

1. PARENT AND CHILD — HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION — WRONGFUL REMOVAL OR RETENTION.

A person who, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, seeks the return of a child wrongfully removed to or retained in the United States must establish by a preponderance of the evidence that the child was an habitual resident of the country to which return is sought, that the person had sole or joint rights of custody under the laws of that country, and that the person was exercising those custody rights at the time of

the child's removal or retention (Hague Convention on the Civil Aspects of International Child Abduction, Art 3; 42 USC 11603[e][1]).

2. PARENT AND CHILD — HAGUE CONVENTION ON THE CIVIL ASPECT OF INTERNATIONAL CHILD ABDUCTION — WRONGFUL REMOVAL OR RETENTION — MANDATORY RETURN.

The Hague Convention on the Civil Aspects of International Child Abduction provides for the mandatory return of a child to its country of habitual residence upon a judicial determination that the child has been wrongfully removed to or retained in another country, unless a person opposing the return establishes by a preponderance of the evidence that an exception specified in the Hague Convention applies (Hague Convention on the Civil Aspects of International Child Abduction, Art 12, 13, 20; 42 USC 11603[e][2][A],[B]).

3. PARENT AND CHILD — HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION — HABITUAL RESIDENCE.

A court, in determining the habitual residence of a child alleged to have been wrongfully removed to or retained in another country and whose return is sought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction primarily looks to the child's past experience; habitual residence is the place where the child had been physically present for an amount of time sufficient for acclimatization and that has a degree of settled purpose from the child's perspective.

*Thomas P. Fruechtenicht*, for the plaintiff.

*William B. Hankins*, for the defendant.

Before: O'CONNELL, P.J., and MACKENZIE and GAGE, JJ.

GAGE, J. In this appeal, we are asked to determine the appropriate country of residence of two minor children. Petitioner Gaby Harkness is a German citizen. Respondent James Edward Harkness is an American citizen enlisted in the United States Army. Both of their minor children apparently have dual citizenship. The other respondents are the children's pater-

nal grandparents.[1] Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention), petitioner filed a petition in the circuit court for the return of the two children from their grandparents' home in Michigan to the Federal Republic of Germany. The circuit court granted the petition and ordered that the children be returned to petitioner's custody. Respondent appeals that order as of right. We affirm.

Petitioner Gaby Harkness and respondent James Edward Harkness met in 1989 in Germany, where respondent was then stationed. Their first child was born in Germany before their 1990 marriage. When respondent was assigned to serve in the Persian Gulf War, the couple agreed that petitioner and their daughter would spend time with respondent's parents, Ross and Mary Ried, in Mason, Michigan. Petitioner testified that she and the Rieds did not get along well, and she and the child soon returned to Germany. After the war, respondent was stationed in Fort Stewart, Georgia, and petitioner and their daughter returned to the United States. For 2 to 2½ years, the family lived in Georgia, where a second daughter was born. They returned to Germany in 1993 and established an apartment in Baumholder.

In 1995, respondent was reassigned to Macedonia. He suggested that petitioner and the children again return to the United States for a visit with his parents. Here, the parties' versions of events differ. According

---

[1] Although Ross Ried and Mary Ried are listed as parties to the action, the designation "respondent" throughout the opinion refers to James Harkness. The custody battle is actually between Gaby and James Harkness. The Rieds would not receive permanent custody of the children under either German or American law.

to petitioner, she planned to visit with her in-laws and then return to Germany with the children. According to respondent, the parties decided that petitioner and the children would remain in the United States for the duration of his stay in Macedonia. Petitioner and the children arrived in Michigan near the end of July 1995. The parties agree that after three or four weeks with the Rieds in Michigan, petitioner returned to Germany without the children. Petitioner contends she left the children in the United States because their travel papers were inexplicably missing. Respondent avers that he had returned to Germany from Macedonia early, the couple wished to spend time alone together, and they mutually decided to leave the children in the care of his parents in Michigan.

When petitioner came to the United States for this last visit, she purchased a round trip ticket for herself but purchased only one-way tickets for the two girls. Petitioner explained that, as a German citizen, she was required to purchase a round trip ticket for herself, but she did not have sufficient funds to purchase three sets of round trip tickets. She therefore planned to buy return tickets for the girls in the United States. According to petitioner, she packed all of her official papers, including the children's birth certificates and passports, in a particular bag that she had with her during her last visit to Michigan. When she decided to leave Michigan, the Rieds drove petitioner and the children to the airport. At the airport, according to petitioner, she discovered that the bag was missing. Because she could not prove that the children were hers, she left the children with her in-laws and returned to Germany alone. The bag was eventually

found in the family's apartment in Baumholder, Germany.

In December 1995, respondent told petitioner he wanted a divorce. Petitioner contacted a lawyer in Germany and filed for divorce and custody of the children. In March 1996, she filed for return of the children to Germany under the Hague Convention. There remains some question about whether respondent was notified of the German custody hearing. However, this issue was not raised in this appeal. Respondent testified that he received some papers in German in June 1996 but was unable to read them or find a translator through the Army's Judge Advocate General's office. Petitioner testified that her German attorney contacted respondent and that she personally informed respondent's parents about the hearing.

Pursuant to the Hague Convention, a German court found that the couple's last joint customary place of residence was Germany, and German law therefore governed the couple's legal relationship and their relationship to their children. Under German law, each parent had the right to exercise joint parental custody of the children until a contrary decision was entered by a court of law. The German court further found that the retention of the children with their grandparents in Michigan against the wishes of their mother was wrongful and ordered their return to petitioner's custody in Germany.

Upon petitioner's petition, also pursuant to the Hague Convention, a second hearing was held in the Ingham Circuit Court to determine whether the children should be returned to petitioner in Germany. The circuit court found that service on respondent appeared to comport with German law and noted that

it doubted respondent's story about being unable to find a translator on an American army base in Germany. The court further held that the habitual residence of the children was in Germany and that petitioner had made "concerted efforts" to seek return of the children to Germany. The circuit court ordered the return of the children to petitioner's custody in Germany.

Respondent now argues that the circuit court erred in holding that the children's habitual residence under the Hague Convention was in Germany and that petitioner was exercising her parental custody rights at the time the children were retained in the United States. These issues have not been addressed by Michigan courts and are therefore of first impression. We review the circuit court's factual determinations for clear error. *Friedrich v Friedrich*, 78 F3d 1060, 1064 (CA 6, 1996) (hereinafter *Friedrich II*); *People v Garcia*, 398 Mich 250; 247 NW2d 547 (1976). The circuit court's interpretation of and conclusions about American, foreign, and international law are reviewed de novo. *Friedrich II, supra*; *Beason v Beason*, 435 Mich 791; 460 NW2d 207 (1990).

The Hague Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." The Hague Convention, Preamble. The Federal Republic of Germany and the United States are signatory nations. In the United States, the enabling legislation is codified as the International Child Abduction Remedies Act, 42 USC 11601 *et seq*. The Convention's goal is "to curb international abductions

of children by providing judicial remedies to those seeking the return of a child who has been wrongfully removed." *Tyszka v Tyszka*, 200 Mich App 231, 234; 503 NW2d 726 (1993).

The Hague Convention provides that a removal or retention of a child is "wrongful" if:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State. [Hague Convention, Article 3.]

Thus, pursuant to the Convention, to establish that her children were being wrongfully retained in the United States, petitioner had to prove the following three elements: (1) the children were "habitual residents" of Germany immediately before their retention in the United States, (2) petitioner had either sole or joint rights of custody concerning the children under German law, and (3) at the time the children were retained in the United States, petitioner was exercising those custodial rights. Petitioner's burden of proof is set forth in 42 USC 11603(e)(1), which provides in pertinent part:

> A petitioner in an action brought under subsection (b) [judicial proceedings under the Convention for return of a child or securing rights of access] shall establish by a preponderance of the evidence—

(A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention . . . .

Pursuant to Article 16, after receiving a petition notifying it of a wrongful retention or removal, a judicial authority "shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of notice." Hague Convention, Article 16; *Tyszka, supra* at 235. Moreover, under Article 12, if a court finds a wrongful retention and none of the exceptions found in Article 13 apply, the court of the signatory state "where the child is . . . shall order the return of the child forthwith." Hague Convention, Article 12; *Tyszka, supra* at 235. The issue of custody is then decided in the place of habitual residence by a tribunal with subject-matter jurisdiction. *Id.*

The Convention provides several exceptions to the mandatory return of the child. The person opposing return must establish that

(a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

(b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. [Hague Convention, Article 13.]

In addition, the judicial authority may refuse to return the child if return "would not be permitted by the fundamental principles of the requested State relating to

the protection of human rights and fundamental freedoms," Hague Convention, Article 20, or the authority "finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13. The authority may also refuse to return the child if more than one year has elapsed from the date of the wrongful removal or retention, and it is demonstrated that the child is now settled in the child's new environment. Hague Convention, Article 12. A respondent opposing the return of a child retained in the United States must establish the exceptions set forth in Article 13b (return poses a grave risk) or Article 20 (return is not permitted by American human rights principles) by a preponderance of the evidence. 42 USC 11603(e)(2)(A). A respondent must establish any other exceptions to mandatory return set forth in Article 12 or 13 by a preponderance of the evidence. 42 USC 11603(e)(2)(B).

In the present case, the circuit court determined that the last established residence of the parties was in Germany because this was where the parties had last resided together and where they still maintained an apartment. The court further determined that Michigan was a temporary residence for the mother and children but was never the residence of the father with the children. The court noted that respondent was never the "intended custodian" of the children in the United States and that the children had been living with their grandparents who had no custody rights to them. The circuit court deferred to the German court with regard to the custody issue and noted that petitioner was "in fact exercising parental

custody and parental rights with the children" throughout the entire period that respondent was stationed in Germany, Macedonia, and Bosnia. The court also determined that although petitioner left the children with the Rieds when she returned to Germany, she did not abandon them and did not agree that they would permanently reside with the Rieds. Therefore, the circuit court determined, the trip to the United States was purely for visitation and not to establish a new residence.

Respondent had also argued to the circuit court that the children would be placed at grave risk if they were returned to Germany. The court ruled that although there was some evidence of modes of discipline by petitioner of which the circuit court did not approve, nothing rose to the level of grave risk within the meaning of the Convention. Moreover, whether the move would be psychologically damaging to the children did not constitute a grave risk in determining the issue of which jurisdiction would decide the issue of custody. The court further stated that "German law is similar to American law and custody rights are only terminated by judicial action." Respondent does not argue on appeal that the circuit court erred in its determination that grave risk to the children was not present in this case.

We hold that the circuit court did not clearly err in its finding that petitioner had established by a preponderance of the evidence that she was exercising her custodial rights at the time the children were retained in the United States. "Custody rights," under the Convention, "may arise in particular by operation of law or by reason of an agreement having legal effect under the law of the State." Hague Convention,

Article 3; *Friedrich II, supra* at 1064. "German law gives both parents equal de jure custody of the child, German Civil Code 1626(1), and with a few exceptions, this de jure custody continues until a competent court says otherwise." *Friedrich II, supra* at 1064.

Petitioner's testimony clearly established that she did not abandon the children with the Rieds. There was no testimony indicating that either party planned to leave the children with the Rieds on a permanent basis. Although petitioner apparently waited seven months before beginning proceedings to compel return of the children to Germany, it also appears that respondent told her he would return to the United States to get the children but changed his mind after the parties began divorce proceedings in December 1995. Petitioner began proceedings under the Hague Convention just three months later in March 1996.

The more difficult issue is whether the children were "habitual residents" of Germany before the time petitioner left them with the Rieds in the United States. Neither the Convention nor the enabling legislation defines the term "habitual resident." Little case law exists regarding the construction of the term. *Friedrich v Friedrich*, 983 F2d 1396, 1400-1401 (CA 6, 1993) (hereinafter *Friedrich I*). As a consequence, the facts and circumstances of each case must be assessed. *In re Prevot*, 59 F3d 556, 559 (CA 6, 1995). The intent is for the concept to remain fluid and fact-based without becoming rigid. *Id.* The British High Court of Justice made the following statement in *In re Bates*, No CA 1122.89, Family Court Division, Royal Court of Justice, United Kingdom (1989):

> It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions. [*Id.* at 10, quoting Dicey & Morris, The Conflicts of Laws 166 (11th ed).]

As noted, the determination of "habitual residence" depends largely on the facts of the particular case. For guidance in our analysis, we have reviewed two similar cases decided by federal courts. In *Feder v Evans-Feder*, 63 F3d 217 (CA 3, 1995), the parties were both American citizens who met in Germany in 1987. They had one child while living in Germany. In 1990, the family moved to the United States when Mr. Feder accepted employment at a bank in Philadelphia. In August or September 1993, he was offered a position in Australia. Despite Mrs. Feder's reservations, the couple moved to Australia in January 1994. *Id.* at 218-219. In June 1994, Mrs. Feder took the child and went to the United States, allegedly to visit her parents. *Id.* at 219-220. In July, when Mr. Feder went to visit them in their still unsold house in Pennsylvania, he was served with a complaint seeking a divorce and custody of the child.

Mr. Feder commenced a proceeding in Australia, applying for the return of the child under the Hague Convention. The Australian court issued an opinion declaring that the couple and their child were habitual residents of Australia immediately before Mrs. Feder's retention of the child in the United States, that Mr. Feder had joint rights of custody under Australian law and was exercising those rights at the time of retention, and that Mrs. Feder's retention was

wrongful within the meaning of the Hague Convention. *Id.* at 220.

Mr. Feder then filed a petition in the federal district court in Pennsylvania, which held that the habitual residence of the child was the United States and that the mother had not wrongfully detained him here. *Id.* at 220-221. The Third Circuit Court of Appeals reversed the district court's decision, holding that the child's habitual residence was Australia. The court stated:

> Guided by the aims and spirit of the Convention and assisted by the tenets enunciated in [*Friedrich I*] and [*In Re Bates*], we believe that a child's habitual residence is the place where he or she had been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there. [*Id.* at 224.]

When the court applied its definition of habitual residence to the facts of the case, it concluded that Australia was the child's habitual residence immediately before his retention in the United States by Mrs. Feder. The court noted that the child had stayed in Australia for six months, "a significant period of time for a four-year-old child." *Id.* The court also stated that the couple had both agreed to move to the country and live there with one another and their son. *Id.* Finally, the court noted that the district court had placed undue emphasis on the fact that the child had spent most of his years in the United States, and that

the court had disregarded the present, shared intentions of the parties. *Id*

We also review *Friedrich I, supra,* in which the father was a German citizen and the mother was an American citizen stationed in Germany. The parties married in December 1989 and had a child that same month. The child lived in Germany until early 1991. In May 1991, the child accompanied Mrs. Friedrich to the United States for a ten-day visit, after which they returned to Germany. On August 1, 1991, Mrs. Friedrich and the child left for the United States without Mr. Friedrich's knowledge or consent. She began divorce proceedings in Ohio on August 9, 1991. Mr. Friedrich filed a claim in Germany for parental custody on August 22, 1991, and the German court granted Mr. Friedrich custody of the child. He then filed an action in the United States, alleging that the child had been wrongfully removed from Germany in violation of the Hague Convention, but the district court denied his claim. *Id.* at 1398-1399.

The Sixth Circuit Court of Appeals reversed the decision of the district court, finding that the child's habitual residence was Germany. The court relied heavily on the fact that the child had spent most of his life in Germany. In so concluding, the court stated that in determining habitual residency it "must look back in time, not forward. . . . [F]uture plans . . . are irrelevant to our inquiry." *Id.* at 1401. The court must also "focus on the child, not the parents, and examine past experience, not future intentions." *Id.* at 1401.

The present case is difficult in that the children spent roughly equal amounts of time in the United States and Germany. Furthermore, the case may be distinguished from *Feder* in that the parties appar-

ently had not agreed upon which country they would maintain as their long-term residence. Both parties testified that they had discussions about where they would live after respondent was released from the military.[2] According to petitioner, respondent wanted to return to the United States, but petitioner did not want to return because she did not get along well with his parents. Petitioner stated that the parties never resolved the issue of where they would live after respondent was released from the army. She denied the existence of any agreement that the parties would live in the United States permanently. According to respondent, however, he told petitioner that he could not find employment in Germany because of his deficient German language skills. Respondent testified that the parties planned to move to the United States after he was discharged from the army.

As the Sixth Circuit Court of Appeals noted, however, the parties' future intentions are not relevant to the matter at hand, except insofar as the parties' actions in the past correspond with their testimony about what they agreed upon and intended as far as residency. Thus, this Court should look primarily to the children's past experiences. *Friedrich I, supra.* It appears that the children only had two "permanent" residences. The first was in Fort Stewart, Georgia, where the parties lived from 1990 or 1991 until 1993. The second was in Baumholder, Germany, where the parties resided from 1993 until 1995 (and petitioner

---

[2] Respondent was originally scheduled to be released from the army in 1996, but he reenlisted. His current release date is January 2, 1999. He testified, however, that he had contacted the Army Community Service Program in an effort to be released earlier on a hardship discharge.

apparently still resides). The trial court did not consider the home of the Rieds to be a "permanent" residence, finding that petitioner was only visiting respondent's parents and had no intentions of moving to Michigan. In any case, the court noted that Mason, Michigan, had never been the residence of the father and the children. The only places that the parties had lived together with their children were Fort Stewart and Baumholder.

Respondent further argues that the trial court erred in equating "habitual residence" with the last established residence. While we agree that "habitual residence" should not simply be equated with the last place that the child lived, the court's opinion does not indicate that this was its only consideration. As noted in *Feder, supra* at 224, a determination of habitual residence must take into account whether the child has been physically present in a country for an amount of time "sufficient for acclimatization."

In the present case, the court noted that the apartment in Germany was the last place the parties had resided together as a family unit. The court also noted that the parties kept the apartment in Germany and that the majority of their belongings were still in the apartment. Thus, the court found no indication that the parties intended to abandon that residence and to establish a new residence in the United States. The fact that the parties kept most of their belongings in Germany rather than the United States does not negate the assertion that they planned to move to the United States. It does, however, lend credibility to petitioner's assertion that she never intended to move, and she thought the parties would settle down in Germany on a more permanent basis after respon-

dent was released from the military. Given these factors, we conclude that the trial court did not err in holding that the habitual residence of the parties' children was Germany.

Respondent also argues that petitioner abandoned the children when she left them with the Rieds, and therefore she had acquiesced in their retention. The trial court disagreed with this assertion, noting that petitioner had made "concerted efforts" to remedy the situation and to seek return of the children. Even if the parties originally planned to leave the children with Mr. and Mrs. Ried for a time while they stayed in Germany, petitioner's testimony clearly establishes that she intended to take the children with her when she arrived at the Detroit airport in August 1996. Petitioner's delay in instituting proceedings to recover the children can be attributed to her reliance on respondent's statement that he would return to the United States to retrieve the children, and that this plan changed when he told petitioner he wanted a divorce. Petitioner began proceedings under the Hague Convention within three months after she learned that respondent planned to divorce her.

We note that the parties' testimony was often contradictory, and the parties testified that they had different understandings of their future plans and of their intent to leave the children with the Rieds when petitioner returned to Germany in 1995. The circuit court noted, however, that it had taken into account its own assessment of the credibility of the witnesses in making its decision. Because the circuit court was clearly in the best position to do so, this Court should defer to that court's factual findings unless they

appear clearly erroneous. See *People v Brannon*, 194 Mich App 121, 131; 486 NW2d 83 (1992).

We conclude that the circuit court did not err in determining that Germany was the children's "habitual residence" and that petitioner was exercising her custody rights at the time of the wrongful retention in the United States. We therefore affirm its order returning the children to Germany.

Affirmed.