**Estelle Marguerite BOCQUET,**
**Petitioner,**

**v.**

**Kamal OUZID, Respondent.**

**No. 02–21819–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

July 18, 2002.

Jorge E. Reynardus, III, Holland & Knight, Miami, FL, for Plaintiff.

Alexander Joseph Alfano, Miami, Fl, for Defendant.

Greg Anderson, guardian ad litem, Stack Fernandez, Miami, Fl, for Noe Salah Ouzid.

### ORDER

JORDAN, District Judge.

Estelle Bocquet filed a petition against Kamal Ouzid pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986) (Hague Convention) and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601–10, seeking the immediate return of the couple's five-year-old son, Noe Salah Ouzid, to France. After conducting a show cause evidentiary hearing on July 2, 2002, I find that Mr.

Ouzid wrongfully removed Noe from France, his place of habitual residence—first to Algeria and then to the United States—on or about August 30, 2000. Accordingly, as authorized by the Hague Convention and the ICARA, Noe is hereby ordered returned to France with Ms. Bocquet.

## I. THE HAGUE CONVENTION AND THE ICARA

The Hague Convention, to which the United States and France are signatories, was adopted to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble, 51 Fed.Reg. at 10,498. In the United States, the Hague Convention was implemented by the ICARA. The underlying premise of the Hague Convention is that a child's country of "habitual residence" is the place where questions of custody and access are best decided. *See Croll v. Croll,* 229 F.3d 133, 137 (2nd Cir. 2000) (citing Elisa Perez–Vera, *Explanatory Report: Hague Conference on Private International Law,* in 3 ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION (CHILD ABDUCTION) 426, 434–35, ¶ 34 (1980)). The Convention's purpose is therefore to "restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." *Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 376 (8th Cir.1995) (citations omitted). Under the Hague Convention and the ICARA, a removal or retention is considered wrongful if

(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3, 51 Fed.Reg. at 10,498.

 In order to establish a prima facie case of wrongful removal or retention under the ICARA and the Hague Convention, a petitioner must show by a preponderance of the evidence that (1) the habitual residence of the child immediately before the date of the alleged wrongful removal was in the foreign country; (2) the removal breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the removal. *See Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998) (citing 42 U.S.C. § 11603(e)(1)(A)); *Pesin v. Osorio Rodriguez,* 77 F.Supp.2d 1277, 1284 (S.D.Fla. 1999), *aff'd,* 244 F.3d 1250, 1253 (11th Cir. 2001). Once that burden is met by the petitioner, the ICARA requires a child who has been wrongfully removed or retained to be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." *See Lops,* 140 F.3d at 936 (citing 42 U.S.C. § 11601(a)(4)). A district court considering an ICARA petition cannot decide the underlying custody dispute, but only has jurisdiction to decide the merits of the wrongful removal claim. *See Lops,* 140 F.3d at 936 (citations omitted).

## II. FACTS AND PROCEDURAL HISTORY

Ms. Bocquet and Mr. Ouzid are the parents of Noe, who was born in Miami, Florida, on October 6, 1996. Ms. Bocquet is a citizen of France and a flight attendant for Corsair Airlines, based in France. Mr. Ouzid is a citizen of Algeria and resides in Miami, Florida. He is apparently self-

employed, though it is unclear in what capacity.

Mr. Ouzid and Ms. Bocquet lived with Noe in Miami from the time of his birth until December of 1998. Ms. Bocquet and Noe traveled to France six to eight times during that period (as a result of Ms. Bocquet's visa restrictions) and were gone two to three weeks each trip, with the exception of one or two trips where they were gone about a month. Once during that period, Mr. Ouzid went to France for four or five weeks as well. Noe traveled on his own United States passport and French passport, as well as being listed on both Mr. Ouzid's and Ms. Bocquet's passports. While in Miami, Mr. Ouzid owned a pizzeria and Ms. Bocquet worked at the pizzeria, though she received no pay. In December of 1998, Ms. Bocquet returned with Noe to France and resumed working as a flight attendant. Sometime in late May of 1999, Ms. Bocquet returned to Miami with Noe, left him with Mr. Ouzid, and returned to France. Shortly thereafter, Mr. Ouzid sold his pizzeria.

Ms. Bocquet returned to Miami for five days in June of 1999, then went back to France and enrolled Noe in a pre-school there, where he would attend in September. In July of 1999, Mr. Ouzid traveled to Algeria with Noe for three to four weeks, and from there, met Ms. Bocquet in Madrid, Spain, on August 10, 1999. They spent four days in Madrid together, and then Mr. Ouzid and Noe returned to Miami. The following week, Mr. Ouzid and Noe met Ms. Bocquet in Santo Domingo, Dominican Republic, for a week before Mr. Ouzid returned to Miami with Noe on August 22, 1999. Two days later, on August 24, 1999, Mr. Ouzid went to Montreal to stay with his sister, and then returned to Miami again on September 7, 1999. On September 10, 1999, Mr. Ouzid and Noe traveled to Algeria. In December of 1999, Mr. Ouzid and Noe went to France, where they lived in an apartment with Ms. Bocquet in Romorantin, France. Noe started pre-school there.

Mr. Ouzid left France in January of 2000, but returned on a three-month tourist visa in February of 2000. The family lived together in an apartment in Milley la Foret. On April 8, 2000, Ms. Bocquet signed a three-year lease for a new apartment. Mr. Ouzid loaned Ms. Bocquet some money to do so.

Around this time, Mr. Ouzid applied for a temporary residency permit to live in France. On May 15, 2000, the family returned to Miami. Ms. Bocquet and Mr. Ouzid married there on May 16, 2000. Ms. Bocquet returned to France a few days later, and Mr. Ouzid and Noe returned to France on June 4, 2000. On June 25, 2000, Mr. Ouzid, Ms. Bocquet, Ms. Bocquet's father, and Noe traveled to Montreal from France for a jazz festival. Ms. Bocquet returned to France on July 6, 2000, and Mr. Ouzid, Ms. Bocquet's father, and Noe returned on July 11, 2000.

On August 23, 2000, Ms. Bocquet and Mr. Ouzid received a letter about his temporary residency permit, requesting that they provide additional tax information and the date that Mr. Ouzid had first entered France. Sometime the next month, Mr. Ouzid and Noe traveled again to Montreal, but returned to France on August 27, 2000. They traveled, as they had on many of their trips, on discounted airline vouchers that Ms. Bocquet had provided through Corsair. Those vouchers were undated, good for one year, and not flight specific. Ms. Bocquet provided these vouchers to Mr. Ouzid from 1996 through 2001.

At the time of their return to France, Ms. Bocquet was on an assignment with Corsair on a flight to San Francisco. Upon her return to France on August 30, 2000, Ms. Bocquet received a cellular

phone message from Mr. Ouzid informing her that he was taking Noe to Algeria that day. When Ms. Bocquet arrived at her apartment, Noe and Mr. Ouzid were gone. Mr. Ouzid had left a handwritten note in French and English. He had also taken a number of her household and personal papers, personal items, and a credit card that belonged to Ms. Bocquet. He also took and cashed a check for 5,000 French francs that Ms. Bocquet had left Mr. Ouzid as payment toward money she owed him, for renting the apartment in Milley la Foret.[1]

On September 1, 2000, Ms. Bocquet swore out a complaint with the French police against Mr. Ouzid for removing their child from France without her permission. She then retained a French attorney who attempted to utilize a Franco–Algerian treaty for the return of Noe. Ms. Bocquet was able to speak to Noe at times by telephoning the house of Mr. Ouzid's mother in Algeria. Mr. Ouzid subsequently came to France three or four times over the next several months, but did not bring Noe with him. During those visits, Ms. Bocquet and Mr. Ouzid met and created three documents, one of which is signed, regarding their relationship with Noe, his custody, and his living arrangements.[2]

After Mr. Ouzid took Noe to Algeria, Ms. Bocquet tried to obtain a visa to visit Algeria. Ms. Bocquet needed an Algerian resident who owned property there to invite her to come. She requested that Mr. Ouzid assist her, but Mr. Ouzid did not do so. Mr. Ouzid testified that he was not able to help her because he was not a resident of Algeria, and his mother could not assist because his deceased father's name was still on the receipt of the house

his mother rented there. There was no satisfactory explanation, however, as to why no one else from Mr. Ouzid's family was able to help with the visa.

In July of 2001, Ms. Bocquet received an order of non-conciliation from the French court.[3] Eventually, Ms. Bocquet found a fellow flight attendant with relatives who lived in Algeria, and in August of 2001, she went to Algeria to search for Noe. Mr. Ouzid testified that he did not know Ms. Bocquet was coming to Algeria, and left for the United States with Noe the same day she arrived in Algeria. Consequently, after an unsuccessful search for Noe in Algeria, Ms. Bocquet returned to France.

In September of 2001, Ms. Bocquet contacted Bennett and Kathy Kennedy in Miami, friends of Mr. Ouzid and Ms. Bocquet from the time of Noe's birth. The Kennedys acknowledged that they had seen Noe in Miami and agreed to set up a meeting for Ms. Bocquet and Noe in Miami, but would not tell her where Noe and Mr. Ouzid were living. In October of 2001, Ms. Bocquet went to Miami and saw Noe over ten days, always in public places, and always with Mr. Ouzid present. The Kennedys and Mr. Ouzid continued to keep Noe's address from Ms. Bocquet. Mr. Ouzid testified that he kept his location secret because he feared Ms. Bocquet, who had previously threatened to buy a gun and to have a friend of Ms. Bocquet's find him. Those threats, Mr. Ouzid testified, took place in France in December of 2000, and at one other time on the phone. Ms. Bocquet, who admitted she had made a threat to shoot Mr. Ouzid, testified that it happened during one of their meetings in a public place in Miami, during one of

---

1. Mr. Ouzid later used the credit card, but never spent more than the amount that Ms. Bocquet owed him. He also had previously used the credit card to buy groceries or supplies for the family.

2. These documents are discussed later.

3. Ms. Bocquet testified that this was equivalent to a formal separation which, under French law, must issue before a divorce will be granted.

many heated arguments she had with Mr. Ouzid about Noe's living arrangements, in which Mr. Ouzid had told her he would prevent her taking Noe back to France, and if she did so, he would take Noe away again.[4]

While in Miami, Ms. Bocquet went to the French consulate, where she was advised to continue working through her French attorney and apply for Noe's return pursuant to the Hague Convention. She returned to France and filed a request for Noe's return pursuant to the Convention.

Ms. Bocquet returned to Miami to see Noe in November of 2001 and in January of 2002, but always in a public place and with Mr. Ouzid present. Ms. Bocquet also wrote numerous postcards to Noe at the Kennedys' address throughout this period.

In March of 2002, the French court issued a divorce to Ms. Bocquet, and, basing its decision on Mr. Ouzid's move to Algeria and then to the United States without the permission of Ms. Bocquet, gave sole parental authority of Noe to Ms. Bocquet. Additionally the court ordered that Noe would not be allowed to travel out of the country without his mother's authorization, and reserved Mr. Ouzid's visitation and accommodation rights. The court, finding that the divorce was the "exclusive fault" of Mr. Ouzid, also required him to pay Ms. Bocquet the amount of 50,000 French francs in damages, with an additional 20,-000 French francs for her costs in pursuing her remedies under law, and 500 French francs monthly for child support. See Petitioner's Exh. 2.

In June of 2002, the National Center for Missing Children located an address for Mr. Ouzid and Noe in Miami, and subse-quently confirmed that address. After an *ex parte* evidentiary hearing on June 18, 2002, I issued an order to show cause and a warrant for the arrest of Noe, so that the child and Mr. Ouzid could be brought to court for a preliminary hearing. On June 19, 2002, I appointed Greg Anderson, Esq., as *guardian ad litem* for Noe,[5] and at the request of Mr. Ouzid, continued the hearing in order to afford him the opportunity to retain counsel. An evidentiary hearing was then held on July 2, 2002. Mr. Ouzid was represented by counsel at this hearing.

## A. THE HABITUAL RESIDENCE OF NOE IMMEDIATELY BEFORE HIS REMOVAL WAS FRANCE.

Neither the Hague Convention or the ICARA defines "habitual residence," but the relevant period is the time immediately before the alleged wrongful removal and retention. *See Shalit v. Coppe*, 182 F.3d 1124, 1127 (9th Cir.1999) (quoting Hague Convention, Art. 3(a): "Removal or retention of a child is wrongful where it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention."). The specific facts and circumstances of each case must be therefore be considered. *See Zuker v. Andrews*, 2 F.Supp.2d 134, 136–37 (D.Mass.1998), *aff'd*, 181 F.3d 81 (1st Cir.1999). The conduct, intentions, and agreements of the parents during the time period preceding the removal are important factors to be considered, particularly where young children are involved. *See Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995) (a determination of whether any particular place is the child's habitual residence must focus

---

4. Ms. Bocquet also testified at the initial *ex parte* hearing that Mr. Ouzid had threatened to jump off a roof with Noe and make them both "ghosts."

5. On behalf of the court and the parties, I would like to thank Mr. Anderson for his exemplary *pro bono* representation of Noe in this matter.

on the child and "consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there"). *See also Pesin,* 77 F.Supp.2d at 1285 (focusing on parents' actions and shared intentions where children were four and six at the time of the alleged wrongful retention, and finding that parents lacked a shared intention for children to remain in Florida). Where there is no shared or settled parental intent, a prior habitual residence should not be considered to be abandoned unless "the objective facts point unequivocally" to such a conclusion. *See Mozes v. Mozes,* 239 F.3d 1067, 1079–82 (9th Cir.2001) (quoting *Zenel v. Haddow,* 1993 S.L.T. 975, 979 (Scot. 1st Div.), and holding that in the absence of settled parental intent, courts should be slow to infer from signs of a child's familiarity with the new country that earlier habitual residence has been abandoned).

As is evident from the chronology of Noe's life from the time of his birth until the present, he was constantly traveling from country to country. Though born in the United States, he went to live in France, then traveled many times to Algeria, to the United States, to Canada, and back to France. He lived with Ms. Bocquet in France from December 1998 through May of 1999, when he returned to the United States for the summer. He lived with Mr. Ouzid from June of 1999 until December of 1999, but Ms. Bocquet came to visit him in Miami, and also met Noe and Mr. Ouzid in Spain and in the Dominican Republic during that period. Though Ms. Bocquet had enrolled Noe to begin pre-school in September in France, Mr. Ouzid apparently had other plans. Noe and Mr. Ouzid traveled to Algeria and to Canada before returning to France in December of 1999. Noe then began pre-school in France, and though Mr. Ouzid left France in January of 2000, he returned in February on a three-month visa

and around that time applied for a temporary residency permit that would allow him to stay in France for up to ten years. The couple returned to marry in Miami, but Ms. Bocquet's undisputed testimony is that this was, in part, because they could do so more quickly in the United States and they thought it would help Mr. Ouzid's application for residency in France. The family returned to France and lived together in the apartment in Milley la Foret until Mr. Ouzid left France with Noe in August of 2000.

 Though Mr. Ouzid and Ms. Bocquet both traveled with Noe during the period they lived in France, the evidence establishes that the family was living together in France at the time Mr. Ouzid left with Noe. Mr. Ouzid created and presented pie graphs, *see* Respondent's Exh. 4, which show that in 1999 and in 2000, the period relevant under the Hague Convention and the ICARA, Noe spent the vast majority of the time in France and attended pre-schools there. There was no settled parental intent to leave France. Indeed, Ms. Bocquet had signed a three-year lease on her apartment and Mr. Ouzid had applied for a temporary residency permit. Thus, I find by a preponderance of the evidence that France was the habitual residence of Noe immediately before his removal to Algeria and the United States. *See Feder,* 63 F.3d at 224 (citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1401–03 (6th Cir.1993) (*Friedrich I* ) (citations omitted) (to determine habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions)). *See also Harkness v. Harkness,* 227 Mich.App. 581, 577 N.W.2d 116, 123 (1998) (upholding trial court's finding that Germany was the children's habitual residence because the apartment in Germany was the last place the parties had resided together as a family unit and "the

court found no indication that the parties intended to abandon that residence and to establish a new residence in the United States").

## B. THE REMOVAL BREACHED MS. BOCQUET'S CUSTODY RIGHTS UNDER FRENCH LAW

■ The Hague Convention establishes that the law of the country in which a child was habitually resident governs decisions as to whether custody rights existed at the time of removal, and it permits judicial notice to be taken of that country's law. *See* Hague Convention, Art. 14, 51 Fed. Reg. at 10,508. *See also Shealy v. Shealy*, 295 F.3d 1117, 1123 (10th Cir.2002). Having found that France was the habitual residence of Noe, I take judicial notice that Articles 371 and 372 of the French Civil Code (FCC), applicable at the time of Noe's removal to Algeria, mandate that a child under the age of eighteen is subject to joint parental authority. *See* Affidavit of Catherine Zviloff at 2, Petitioner's Exh. 8.[6] Article 371(3) of the FCC prohibits the child leaving the family home or being taken away from it without the permission of a parent. *See id.* If the parents cannot agree on what the child's interests require, the decision should be made based on the past practice of the parents, or a family judge can decide if a compromise cannot be reached. *See id.* at 2, 3. I have also considered, for the sole purpose of ascertaining French law, the Judgment of Divorce of the Civil Trial Court of General Jurisdiction of Evry, Department of Essonne, Palais de justice, rue de Mazieres, 91012, which states that Mr. Ouzid's behavior in moving with Noe to Algeria and then to the United States without Ms. Bocquet's agreement to do so constituted a

serious violation of the obligations resulting from joint parental authority, which is usually the rule for parents of a child. *See* Petitioner's Exhibit 2 at 6. Accordingly, I find that if Mr. Ouzid took Noe from France to live in Algeria and then to the United States without Ms. Bocquet's consent, it would be a violation of Ms. Bocquet's custody rights pursuant to French law.

Ms. Bocquet testified that she did not know that Mr. Ouzid was planning to take Noe to Algeria, and that she never gave him permission to do so. I find Ms. Bocquet's testimony to be credible. She immediately reported Mr. Ouzid's actions to the local police, and, significantly, Mr. Ouzid testified that he did not seek or receive Ms. Bocquet's permission to permanently leave France with Noe. Ms. Bocquet continuously sought Noe's return, and though Mr. Ouzid testified that he did inform Ms. Bocquet a few days before he left that he would be going to Algeria, he also testified that, because he had traveled with Noe since May of 1999, he did not believe that he needed Ms. Bocquet's permission for his travels.

Mr. Ouzid also testified that Ms. Bocquet could not have objected to his leaving with Noe because she gave him the discounted tickets he used for the travel. But he also testified that there was never an agreement with Ms. Bocquet that Noe would be taken from France in August of 2000.

Q. Did you and Estelle reach an agreement that you would be taking Noe away from France in August of [2000]?
A. There was no agreement. I was traveling. That was part of my travels.

6. Alternatively, I make this determination of French law under Fed.R.Civ.P. 44.1 ("The court, in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party ... The court's determination [of foreign law] shall be

treated as a ruling on a question of law."). *See generally Seguros Del Estado, S.A., v. Scientific Games, Inc.*, 262 F.3d 1164, 1171 (11th Cir.2001) (citing *United States v. Gecas*, 120 F.3d 1419, 1424 (11th Cir.1997)).

Significantly, Mr. Ouzid also testified that, when he left France, he had no intention of ever returning to live there.

Q. How long did you intend to be in Algeria with Noe when you left France?

A. I was going back to the States to tell you the truth and I just got involved in a lot of business.

* * * * * *

Q. Was it your intent to return to France with Noe after a short time in Algeria?

A. No. We were coming back to the United States.

■ I credit Ms. Bocquet's version, and find that Mr. Ouzid did not have Ms. Bocquet's permission to take Noe to Algeria and the United States. Mr. Ouzid's attempt to characterize his removal of Noe as consistent with his past practice fails. Mr. Ouzid had not previously traveled to Algeria with the intention of leaving France permanently, nor had he previously removed business papers, valuables, and Ms. Bocquet's credit card before his departure. Moreover, it is undisputed that the tickets Mr. Ouzid used were not date or flight specific, making Mr. Ouzid's argument—that Ms. Bocquet's discounted tickets are evidence that she had no objections to his leaving with Noe (or moving away permanently with Noe)—unpersuasive. Accordingly, Mr. Ouzid breached the custody rights of Ms. Bocquet under French law when he removed Noe from the family home in France with the intention of mov-

ing away permanently, and without her permission to do so. *See Wanninger v. Wanninger,* 850 F.Supp. 78, 81–82 (D.Mass.1994) (no acquiescence to permanent retention in United States even if the petitioner consented to the removal for a limited period because the Hague Convention covers both wrongful removal and wrongful retention).[7]

## C. Ms. Bocquet Was Exercising Custody Rights at the Time of the Removal

Mr. Ouzid asserts that Ms. Bocquet "repeatedly abdicated her custody responsibilities" to him because she was "continually absent from home," was therefore "unable to exercise her maternal responsibilities," and relied on Mr. Ouzid for child care. Thus, Mr. Ouzid argues, Noe should not be returned to France because Ms. Bocquet was not exercising custody rights at the time that he left France with Noe.

As the Sixth Circuit wisely opined, however, "an American decision about the adequacy of one parent's exercise of custody rights is dangerously close to forbidden territory: the merits of the custody dispute." *Friedrich v. Friedrich,* 78 F.3d 1060, 1065 (6th Cir.1996) (*Friedrich II* ).

■ In *Friedrich II,* the Sixth Circuit held that under the Hague Convention, a person with valid custody rights under the law of the country of the child's habitual residence cannot fail to exercise those rights "short of acts that constitute clear and unequivocal abandonment of the child." *See id.* at 1066.[8] I generally agree

---

7. Mr. Ouzid further argues that any rights of custody Ms. Bocquet asserts pursuant to the French divorce decree issued in March of 2002, granting her sole custody of Noe, do not suffice to invoke the Convention. I agree that the French court's subsequent decree does not make Mr. Ouzid's removal of Noe in August of 2000 wrongful, and I do not base my determination that Ms. Bocquet's custody rights were breached on that decree. Noe's removal breached Ms. Bocquet's custody

rights under French law pursuant to the shared custody of Noe which existed at the time of his removal.

8. Significantly, the Sixth Circuit recognized that its holding would require a parent, in the event of a separation or custody dispute, to seek permission from the other parent or from the courts before taking a child out of the country of its habitual residence. *See id.* I agree, at least insofar as the removal of the

with *Friedrich* that, "once a court determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *See id.* In this case, the fact that Ms. Bocquet was required by her work as a flight attendant to be away from home—even at times for extended periods—does not mean that she was not exercising her custody rights. The record firmly establishes that during her separations from Noe she was in telephone and mail contact with him, and even when Mr. Ouzid traveled to other countries with Noe, Ms. Bocquet would often meet them and spend time with Noe. Ms. Bocquet arranged for Noe to attend school in France, traveled with him on vacations, and arranged for his childcare when Mr. Ouzid was out of the country and unable to take care of him. That Ms. Bocquet was working as a flight attendant while Mr. Ouzid stayed at home to care for Noe does not mean that Ms. Bocquet was not exercising her custody rights.

In sum, I find that Ms. Bocquet was exercising her custody rights at the time of Noe's removal. I also find, as a matter of fact, that Noe was wrongfully removed from France—Noe's habitual residence at that time—in August of 2000 by Mr. Ouzid.

### IV. MR. OUZID'S DEFENSES

Under the Hague Convention and the ICARA, unless Mr. Ouzid can establish that one of the following four available defenses to a wrongful removal applies, Noe must be returned to France:

(a) The proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment. Hague Convention, Art. 12.

(b) The person seeking return of the child consented to or subsequently acquiesced in the removal or retention. Hague Convention, Art. 13a.

(c) There is a grave risk that the return of the child would expose it to physical or psychological harm. Hague Convention, Art. 13b.

(d) The return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Art. 20.

42 U.S.C. § 11603(e)(2)(B). All four of these defenses should be construed narrowly. *See Friedrich II*, 78 F.3d at 1067. "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Blondin v. Dubois*, 189 F.3d 240, 246 (2nd Cir.1999). And even if an exception is satisfactorily proven, "the courts retain the discretion to order return." *Feder*, 63 F.3d at 226 (citing Pub. Notice 957, 51 Fed.Reg. 10494, 10509 (1986)). Mr. Ouzid appears to only argue the first two defenses, both of which must be proven by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B). First, he argues that Ms. Bocquet failed to commence proceedings within one year of the alleged removal, and that the "settled" exception applies to Noe. According to Mr. Ouzid, Noe has established "deep ties to South Florida, having resided here continuously

---

child is not temporary (e.g., for a vacation). "Any other approach allows a parent to pick a 'home court' for the custody dispute *ex parte*, defeating a primary purpose of the Convention." *Id.*

since August 18, 2001." Respondent's Memorandum of Law at 15. Second, Mr. Ouzid argues that Ms. Bocquet consented to or subsequently acquiesced in Noe's removal to and retention in the United States.

## A. TOLLING OF THE ONE-YEAR TIME PERIOD

It is undisputed that proceedings were not commenced within a year of Noe's removal from France. I note, however, that in *Lops* the district court held that it would be difficult to "conceive of a time period arising by a federal statute that is so woodenly applied that it is not subject to some tolling, interruption, or suspension, if it is shown or demonstrated clearly enough that the action of an alleged wrongdoer concealed the existence of the very act which initiates the running of the important time period." 140 F.3d at 946. The Eleventh Circuit never reached the issue of tolling the one-year period, because it found that the child in that case had not become "settled" within the meaning of the Convention.

At the time the United States Senate was considering ratification of the Hague Convention, a detailed legal analysis of the Convention was made available by the Department of State. *See* 51 Fed.Reg. at 10,494. That analysis was also intended to assist parents, the bench, the bar, and federal, state, and local authorities in understanding the Convention. *See id.* In relevant part, that analysis states:

> The reason for the passage of time, which may have made it possible for the child to form ties to the new country is also relevant to the ultimate disposition for the return petition. If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby

delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.

*Id.* at 10,509.

■ I find the district court's analysis in *Lops* persuasive and hold that the one-year period in this case should begin from the date Ms. Bocquet confirmed Noe's United States address—June 18, 2002.[9] Even if Mr. Ouzid did not conceal Noe's whereabouts in Algeria from Ms. Bocquet—and that fact was not proven by a preponderance of the evidence—she was unable to utilize the Convention there because Algeria is not a signatory to the Convention. She did, in any event, attempt to secure Noe's return pursuant to the Franco–Algerian treaty during that time. By the time Ms. Bocquet was able to utilize the Hague Convention, it had already been close to or more than a year from the time Noe was removed from France, and at that point—once Noe was in the United States—it is undisputed that Mr. Ouzid concealed his whereabouts (and Noe's) from Ms. Bocquet. Mr. Ouzid may have believed he had reason to do so, but this does not change the fact that Ms. Bocquet was deprived of her valid custody rights for over twenty-two months by the very behavior the Convention seeks to prevent—"self help," or "the law of grab and run." *See Miller v. Miller*, 240 F.3d 392, 401 n. 13 (4th Cir.2001). *Cf. Young v. United States*, 535 U.S. 43, 122 S.Ct. 1036, 1040, 152 L.Ed.2d 79 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text

9. At the very earliest, the one-year period was tolled until October of 2001, when Ms. Bocquet first met Mr. Ouzid and Noe in Miami.

of the relevant statute.") (citations and internal quotation marks omitted).

## B. Noe Is Not "Settled" in the United States

Assuming that there should not be a tolling of the one-year period, I consider whether Noe is "settled" in his new environment. Though the term "settled" is not defined in the Hague Convention, according to the State Department's analysis, "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof." *See* 51 Fed.Reg. at 10,509.

█ Mr. Ouzid has not met his burden to prove by a preponderance of the evidence that Noe is settled here, for he has not offered any evidence—let alone substantial evidence—that Noe has been in school, been involved in a play group, attended any religious institution, played in any organized sport teams, or established any other significant connections here. *See David S. v. Zamira S.*, 151 Misc.2d 630, 574 N.Y.S.2d 429, 432 (N.Y.Fam.1991) (finding that the children should be returned under the Hague Convention because they were not yet involved in school, extra-curricular, community, religious, or social activities and had not yet formed meaningful friendships.); *Zuker*, 2 F.Supp.2d at 140–42 (looking to factors such as enrollment in school, extracurricular activities and whether children had established friendships to determine that child had settled in new environment). *See also In re Petition for Writ of Habeas Corpus for Coffield*, 96 Ohio App.3d 52, 644 N.E.2d 662, 666 (1994) (holding that child was not settled because the father apparently attempted to conceal their whereabouts, and over a period of three years only exposed the child to a limited group of friends and relatives).

The *Zamira* court also found that substantial meaningful connections in the country from which the child was removed should be considered. *See* 574 N.Y.S.2d at 433. I note that in this case, Noe appears to have a maternal grandfather, an aunt, and a cousin in France, as well as having already attended two pre-schools there, whereas Mr. Ouzid's family appears to live in Algeria, not in the United States. In any event, Noe's life has, for better or worse, been mostly nomadic, having resided in the United States, France, Algeria, and then—once removed by his father— the United States again. From each of those locations he traveled on trips to the other locations and to Canada, the Dominican Republic, and Spain. He has traveled so frequently back and forth in his young life that he is probably as comfortable on an airplane as many seasoned business travelers.

I also note that Mr. Ouzid's employment history is not one of great stability. Although he owned a pizzeria at one time, it is unclear exactly what Mr. Ouzid now does for a living, or how long he has done it. The record reflects that he received "orders" from Algeria and was in the process of receiving a bank loan at one time, had an export business before that, then "got back into consulting," and apparently now is involved with international markets. *See Koc v. Koc*, 181 F.Supp.2d 136, 154 (E.D.N.Y.2001) (considering respondent's lack of stability in her employment history as a factor in determining that children were not settled). It also appears that Mr. Ouzid has lived at several addresses during his time in the United States. He testified that he lived in Hallandale, stayed with friends in Miami Shores, and most recently has lived at 645 North East 77th St., Apartment no. 4, in Miami, Florida. Accordingly, I find as a matter of fact that Noe was not "settled" in the United States pursuant to the Hague Convention and the

ICARA, even if the one-year period is not tolled.

### C. Ms. Bocquet Did Not Consent to Noe's Removal or Acquiesce to Noe's Retention in the United States

■ Mr. Ouzid claims that Ms. Bocquet consented to Noe's removal and acquiesced in his retention. But Ms. Bocquet's actions from the time of Noe's removal on August 30, 2000, are inconsistent with such consent or acquiescence. She reported Noe's removal to the police on September 1, 2000. She consulted and retained an attorney. She attempted to utilize the Franco–Algerian treaty for Noe's return. Her unrebutted testimony was that she pleaded with Mr. Ouzid to bring Noe back. Indeed, Mr. Ouzid testified that Ms. Bocquet never agreed to Noe's removal. And Ms. Bocquet's application for Noe's return under the Hague Convention is further evidence that she did not consent to his removal. *See, e.g. Lops,* 140 F.3d at 945 n. 26 (evidence amply supported district court's finding that petitioner never consented or acquiesced but rather made concerted efforts to locate the children through international, national, and local agencies); *Tabacchi v. Harrison,* 2000 WL 190576, *11 (N.D.Ill.2000) (holding that petitioner's persistent efforts to keep the child and his subsequent filing of the Hague petition undermined any claim of consent).

■ Mr. Ouzid further argues that Ms. Bocquet acquiesced to his removal of Noe to the United States because she had "continuing and recurring communications, visits, and vacations" with both Mr. Ouzid and Noe, because she brought Noe to him in Miami in May of 1999, and because she continually traveled for work and could not "exercise her maternal responsibilities." *See* Respondent's Memorandum of Law at 16. I do not agree. Acquiescence under the Convention requires "an act or statement with the requisite formality, such as

testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II,* 78 F.3d at 1070 (citations omitted). Although Ms. Bocquet apparently attempted to work toward some resolution of the situation directly with Mr. Ouzid, she continued to seek legal remedies both through the French courts and through international agreements, first utilizing the Franco–Algerian treaty and then the Hague Convention. That Ms. Bocquet arranged visits in order to see Noe, and had an indirect way of communicating to Noe through the Kennedys' address by mail, is insufficient to constitute the unequivocal acquiescence required to satisfy the Hague Convention. *See id.* (citing *Wanninger,* 850 F.Supp. at 81–82 (refusing to construe father's personal letters to wife and priest as sufficient evidence of acquiescence where father consistently attempted to keep in contact with child)).

Furthermore, I do not believe that the fact that Ms. Bocquet had a job that required her to travel frequently necessarily reflects poorly on her ability to exercise her maternal responsibilities, and it certainly does not show the unequivocal acquiescence necessary for the Hague Convention defense. *See Friedrich I,* 983 F.2d at 1402 (habitual residence can be "altered" only by a change in geography and the passage of time, not by changes in parental affection and responsibility, but the change in geography must occur before the questionable removal). If it did, every airline pilot and flight attendant, and indeed, any other individual whose work routine required frequent travel, could be considered to have acquiesced in their children's removal and retention by the other parent. Moreover, from the record before me, it appears that Mr. Ouzid has traveled extensively himself, sometimes with Noe, and at other times without him. Mr. Ouz-

id is not, presumably, arguing that he was in any way unable to exercise his paternal responsibilities because of his own travel.

I am also unpersuaded that Ms. Bocquet's dropping off Noe in May of 1999 showed acquiescence on her part to his removal from France more than a year later. Ms. Bocquet has been consistently fighting to get her son back almost from the moment he was removed in August of 2000. *See Tabacchi*, 2000 WL 190576, at *11 (finding no acquiescence where the petitioner was sending girls and offering financial support but had filed complaints with the police for child abduction; filed for custody in the Italian courts; asked the respondent to bring the child back; and "most importantly, . . . pursued his petition in this court"). Whatever arrangements were made for Noe's care during the summer of 1999, they do not seem to have extended into the following year. *See In the Matter of William Brennan*, 227 A.D.2d 965, 966, 643 N.Y.S.2d 780 (1996) (mother's consent to the child's absence from France for six weeks, and her agreement to allow the child to remain ill the United States for almost another five months, was not acquiescence to the child remaining indefinitely).

Mr. Ouzid presented three documents that resulted from negotiations over Noe's child care and living arrangements. Only one of the documents is signed, and that document was written after Mr. Ouzid had removed Noe to Algeria, when Mr. Ouzid traveled back alone to France without Noe. That signed document, dated February 16, 2001, reads as follows:

Noe is going back to France at the end of February. He will live in Arpajon with his mother and will go to school. His father can visit him when he wants to. We will agree for the "weekends" and holidays. Once, his father will be settle (sic) in USA, Noe will live, and go to school in USA. His mother will be able to visit him when she wants and will get the right to get him for holidays and "week-ends" (let's say 1 week a month). We will get divorced in USA and will settle custody of Noe in USA. The priority will be the stability of Noe.

(Noe is and will be always the center of our common ground." Kamal)

Read and approved

Estelle Bocquet

Petitioner's Composite Exh. 2. Although I do not disregard this and the other unsigned documents and have considered them (individually and collectively), I do not afford them much weight with regard to whether Ms. Bocquet consented or acquiesced to Noe's removal and retention. It is undisputed that when this document was created, Noe had already been taken from France without his mother's consent and Ms. Bocquet had not seen him for six months. Thus, while the French Court may determine that this document is significant and assists in custody determinations, as evidence of acquiescence it is insufficient to meet Mr. Ouzid's burden.

Another unsigned, undated document, written in Ms. Bocquet's hand, was also submitted at the evidentiary hearing. It provides:

Shared parental custody in all countries

1. Noe lives in the USA with his father.

2. He is enrolled in school and has his leisures (sports, music).

3. Estelle will have Noe on all of his vacation times plus 1 week per month.

4. Noe will travel freely in all countries with the mutual authorization of his parents.

5. Noe will freely be in contact with both his parents with no restrictions. The parents will be in charge of these expenses.

6. Noe will choose with whom he would like to live when he will be old enough to be listened to (legally).

7. The parents must not say anything about each other to Noe.

8. Kamal must tell Noe that his mother has never lied.

9. These agreed terms could be modified if things go bad, or if there is danger for Noe.

(Estelle would prefer to have custody of Noe now, Noe is only 5 years old. She promises to have Noe access to communicate with his father on a daily basis. Guarantees visitations rights on Noe's vacations. Not tell anything degrading to Noe. Not ask for any financial help. Will bring Noe on a regular basis without exceeding an absence of 3 month each time and will let Noe decide of his residence when he will be old enough to be listened to).

10. Immediate divorce with mutual consent.

Respondent's Exh. 3.

Mr. Ouzid testified that this document was created in the United States, also after the removal. It, like the previous document, was therefore apparently written when Noe's location was being concealed from Ms. Bocquet, during a time when she was permitted to see Noe in public places only with Mr. Ouzid present, and when she arranged for these visits through the Kennedys. Any weight to be accorded the acknowledgment that Noe should live in the United States must be balanced by the notation after paragraph nine, which clarifies Ms. Bocquet's desire to have Noe in her custody, presumably in France. This document is also insufficient to prove Ms. Bocquet's acquiescence, given that it is unsigned and apparently created after Noe's removal, retention, and concealment.

The third document, dated July 9, 2000, was submitted after the evidentiary hearing and provides as follows:

For K

No personal nuisance (hostility)

Willingness of equitable custody between the two parents for the comfort of Noe

K must settle to welcome Noe

Back to USA.

Respondent's Exh. 5. Created apparently before Noe's removal, this document is unsigned and its meaning is not readily obvious. Was this what K (presumably Mr. Ouzid) wanted? Was this what they were discussing? Was this what Ms. Bocquet wanted? In light of these unanswered questions, the document does not establish acquiescence.

Mr. Ouzid is apparently arguing that these documents show that he and Ms. Bocquet intended for Noe to live in the United States. As an initial matter, courts which have looked at issues of parental "intent," "settled purpose," or "settled intent" have done so to determine the habitual residence of the child, and not to determine acquiescence. *See Mozes*, 239 F.3d at 1076–81. Moreover, to determine habitual residence, "the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401 ("The court must look back in time, not forward.") In this case, for the reasons explained above, the habitual residence of Noe was France.

In any event, the fact that the parties were attempting to establish an agreement as to Noe's future does not establish Ms. Bocquet's acquiescence. She may have participated in the creation of these documents, but she continued to pursue her legal remedies for Noe's return, including the action in this court pursuant to the Hague Convention. *See Pesin*, 77

F.Supp.2d at 1290 (father who allowed his children to remain in Florida while he made "serious and concerted efforts at reconciliation" prior to filing petition did not acquiesce within the meaning of the Convention). *See also Wanninger*, 850 F.Supp. at 82 (no acquiescence where it was established that petitioner's intentions were not to acquiesce but to reconcile his marriage). Thus, Mr. Ouzid has not established by a preponderance of the evidence that Ms. Bocquet acquiesced to Noe's retention in the United States.

## V. CONCLUSION

Because Noe was wrongfully removed from France, his habitual place of residence, and because none of the exceptions to the Hague Convention have been proven by a preponderance of the evidence, Noe should be returned promptly to France in the company of Ms. Bocquet, pursuant to the ICARA and the Convention. No stay will be issued.

By virtue of this order, Ms. Bocquet has the exclusive right to the physical and legal custody of Noe during the period of time required to return him to France. This order, of course, is not a determination of the merits of any custody issues within the meaning of Article 19 of the Convention.

The United States Marshals' Service is directed to ensure that Ms. Bocquet is able to comply with this order, and shall accompany Ms. Bocquet and Noe to the Miami International Airport. All other federal, state, and local law enforcement officers are hereby notified that Ms. Bocquet has the authority and the lawful temporary custody to remove Noe from the United States of America and return with him to France.

The parties are to arrange with Mr. Anderson for return of their original travel documents, copies of which have been filed with the clerk.