**In the Matter of Adrian Karsten LESLIE, an Infant under the age of 16,**

**Anthony Leslie, Petitioner,**

v.

**Karina Noble, Respondent.**

**Nos. 05–80263–CIV–HURLEY, 05–80263–CIV–JOHNSON.**

United States District Court, S.D. Florida.

June 30, 2005.

Lawrence Sheldon Katz, Lawrence S. Katz, Miami, FL, for Petitioner.

Michael Anthony Remy, Richard E. Tejera, Coral Gables, FL, for Respondent.

Karina Noble, Greenacres, FL, pro se.

*ORDER ADOPTING REVISED REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE AND GRANTING ANTHONY LESLIE'S PETITION FOR RETURN OF CHILD TO PETITIONER*

HURLEY, District Judge.

**THIS CAUSE** is before the court upon a petition for return of child to petitioner, filed herein on March 29, 2005. Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603(b), petitioner seeks an order from this court that removes the minor child, Adrian Karsten Leslie, from the possession of his mother and returns him to his habitual residence in the nation-state of Belize. On June 2, 2005, United States Magistrate Judge Linnea R. Johnson issued a report and recommendation which recommended that Mr. Leslie's Hague Convention petition be granted. As of the date of entry of this order, no objections have been filed to Judge Johnson's report and recommendation.

Pursuant to Fed.R.Civ.P. 72(b), "The district judge ... shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule." The rule requires that objections be filed within ten days of service of the report and recommendation, and that the objecting party arrange for transcription of sufficient portions of the record. Fed.R.Civ.P. 72(b). The district judge may then "accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." *Id.* Portions of the report and recommendation that are not specifically objected to are subject to the clear error standard. The identical requirements are set forth in 28 U.S.C. § 636(b)(1).

Upon review of the report of the magistrate judge, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. The revised Report and Recommendation of the United States Magistrate Judge [DE # 40] is **ADOPTED** in its entirety and incorporated herein by reference.

2. Petitioner's Hague Convention petition [DE # 1] is **GRANTED**.

3. The United States Marshals' Service is directed to ensure that within ten (10) days of the date of entry of this order, that petitioner comply with this order, and that the Marshals' Service accompany the petitioner and the minor child to the Miami International Airport for their departure to Belize.

4. Furthermore, the Marshals' Service is ordered to notify all other federal, state, and local law enforcement officers that Petitioner has the authority and the lawful custody to remove Adrian Karsten Leslie from the United States of

America in order to return him to Belize.

5. Finally, petitioner and respondent are ordered to arrange for the return of all original travel documentation to the petitioner, respondent, and the minor child through their respective attorneys.

6. The district court retains jurisdiction to assess any attorneys' fees and costs that may be appropriate pursuant to 42 U.S.C. § 11607. The parties are ordered to follow the procedure for seeking attorneys' fees and costs detailed in Judge Johnson's report and recommendation.

7. The clerk of the court shall enter this case as **CLOSED** and shall **DENY** all pending motions as **MOOT**.

### REVISED REPORT AND RECOMMENDATION

JOHNSON, United States Magistrate Judge.

THIS CAUSE is before the court on ANTHONY LESLIE's (Petitioner) Emergency Petition for Warrant of Arrest in Lieu of Writ of Habeas Corpus and Petition for Return of Child to Petitioner (Petition) (D.E.# 1). Petitioner initiated these proceedings under the provisions of The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,498–502 (1986) [hereinafter Convention] as implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601 *et seq.* This matter was referred to the undersigned United States Magistrate Judge by the Honorable Daniel T.K. Hurley, United States District Judge for the Southern District of Florida (D.E.# 4). The undersigned conducted an *ex parte* emergency hearing on April 1, 2005, at which time she granted initial relief to Petitioner by issuing a Warrant in Lieu of Writ of Habeas Corpus (Warrant) (D.E.# 8).[1] The undersigned also conducted evidentiary hearings on April 21, 2005, and on May 4 and 24, 2005, of which KARINA NOBLE (Respondent) received notice, and all of which she attended represented by legal counsel.[2] After consideration of all the testimony and evidence, the undersigned respectfully recommends that the relief sought in the Petition be granted.

### I. BACKGROUND

Petitioner is the father of ADRIAN KARSTEN LESLIE (Adrian or the minor child).[3] Petitioner and Respondent were

---

1. As a result of that Warrant, the United States Marshal took the minor child into custody and turned him over to Petitioner; the Warrant also required Petitioner to remain with the child at a specified address within the jurisdiction of the Southern District of Florida until further order of this court. Before issuance of the Warrant, Judge Hurley entered an Order on March 29, 2005 (D.E.# 4), requiring that the minor child not be removed from Palm Beach County, Florida, until further order of the court.

2. While the court would normally cite to the volume number of each hearing transcript, the references herein are to the transcribed record for the specific hearing date, since at the time of writing this Report and Recommendation there were no transcriptions of the April 1, 2005, emergency hearing, or of the last evidentiary hearing held on May 24, 2005. Also, it is unknown why the transcript for the May 4, 2005, hearing reflects "Volume 3" on the first page.

3. Neither Petitioner nor Respondent disputes this fact.

never married, but had an intimate relationship, sharing joint living arrangements between sometime in 1999 through late December of 2003. Adrian was born on August 25, 2000, in Belize. Respondent left Belize on April 29, 2004, with the minor child, arriving in the United States on April 30, 2004. Prior to the time of filing of the Petition before this court, and after Respondent's departure from Belize with the minor child, the Supreme Court of Belize awarded legal custody of Adrian to Petitioner. During the pendency of the Belizean custody proceedings and before the Belize Supreme Court's award of custody to Petitioner, the Belize Family Court entered an order sentencing Respondent to three months' imprisonment under the Belizean Criminal Code for failure to comply with visitation schedules set up by the Belize Family Court.

## II. THE PARTIES' ALLEGATIONS

Petitioner alleges that at the end of April of 2004 Respondent, a Belizean citizen, wrongfully removed the minor child, a United States citizen, then approximately three and one-half years old, from Belize, his habitual place of residence, to the United States, and unlawfully retained him in Palm Beach County, Florida, without Petitioner's knowledge or consent.[4] Petitioner further alleges that at the time of the minor child's wrongful removal by Petitioner, there were pending proceedings in Belize commenced by Petitioner wherein he sought legal custody of the minor child. Petitioner alleges Respondent had full no-

tice and knowledge of that unadjudicated matter, and that she participated with legal representation in the proceedings up to the time of her departure with the minor child.[5]

Respondent asserts that when she left Belize with Adrian she had custody of the minor child because Belizean law confers custody of a child born out of wedlock to the mother. She further avers that at the time of her departure Petitioner only had a right of access to Adrian, which is not protected under the Convention and cannot be enforced through ICARA. Also, she contends that she did not deny Petitioner access to Adrian and alleges that she informed Petitioner of her plans to leave Belize, to many, and to live in the United States. Finally, Respondent contends that, shortly after arrival in the United States, she wrote Petitioner notifying him of hers and Adrian's whereabouts, indicating that Petitioner was welcome to visit the minor child. Therefore, she denies Adrian's wrongful removal or retention, or that she breached any rights of custody of Petitioner protected under the Convention.

## III. APPLICABLE LAW

### A. The Convention's Purpose and Framework.

The Convention's stated purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of

---

**4.** Belize is a contracting state to the Convention. *See* http://www.hcch.e-vision.nl/ index_en.php?act=conventions.status & cid=24> (indicating Belize's participation in Convention).

**5.** At the time that Respondent left Belize with the minor child, Petitioner had visitation rights and the Belizean court had ordered a psychological evaluation of the child. Petitioner avers that the psychological evaluation was a necessary evidentiary requirement of the custody proceedings.

their habitual residence, as well as to secure protection for rights of access." Convention Preamble, 51 Fed.Reg. at 10,498; *see also* Eliza Pérez–Viera, EXPLANATORY REPORT: HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, *in* 3 ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION (Child Abduction) 426, 431 ¶ 24 (1981) (Pérez–Viera Report) (defining Convention's philosophical focus of protecting children, interpreting their true interests). Moreover, through its return remedy, the Convention seeks "to restore the pre-abduction status quo and to deter parents from crossing international borders in search of a more sympathetic forum." Convention, Arts. 3, 5, 12, and 13; *Furnes v. Reeves,* 362 F.3d 702, 710 (11th Cir.2004) citing *Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996)). The Convention specifically states that its twin aims are:

> a to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and
>
> b to ensure that rights of custody and or access under the law of one Contracting State are effectively respected in the other Contracting States.

Convention, Art. 1, 51 Fed.Reg. at 10,498. A removal or retention is considered "wrongful" where it breaches rights of custody under the laws of the state of the child's habitual residence immediately before the removal or retention, and where the person having those rights of custody was exercising them either jointly or alone

under the aforesaid laws "or [the rights of custody] would have been so exercised but for the removal or retention." Convention, Art. 3, 51 Fed.Reg. at 10,498; *Lops,* 140 F.3d at 935. Upon a finding of wrongful removal or retention, the Convention requires "the return of the child forthwith." Convention, Art. 12, 51 Fed.Reg. 10,499. The Convention's intent "is to protect *all* the ways in which custody of children can be exercised." Pérez–Viera Report at 446 ¶ 67 (emphasis in original). The sources giving rise to custody rights which the convention seeks to protect encompass all rights within the context of the country of habitual residence's legal system, and the convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Id.; Furnes,* 362 F.3d at 716 n. 12.[6] "Wrongful removal or retention" and "wrongfully removed or retained" includes "a removal of a child before the entry of a custody order regarding that child." 42 U.S.C. § 11603(f)(2). Moreover, the United States grants full faith and credit to judgments of foreign courts. 42 U.S.C. § 11603(g).

Further, the party seeking a child's return must show by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 11603(e)(1)(A); *Lops,* 140 F.3d at 936. Once a petitioner satisfies that burden, Article 12 of the Convention requires the prompt return of the child unless a respondent pleads affirmatively; and proves, one of the four exceptions listed in the Convention. Convention, Art. 13, 51 Fed.Reg. at 10,499. The

---

**6.** An English decision suggests that under some circumstances a custody order from a court in the country of the child's habitual residence "may itself have custody rights that are violated" by the child's removal without

court consent. *See Furnes,* 362 F.3d at 718 citing *B. v. B.,* 3 W.L.R. 865 (Eng.C.A.1993) (referencing the right held by an "institution or other body" under Article 3 of the Convention).

Convention identifies those exceptions as follows: (i) the person requesting return was not, at the time of the retention or removal, actually exercising custody rights, or had consented to, or subsequently acquiesced in, the removal or retention (Convention, Art. 13a, 51 Fed.Reg. at 10,499; 42 U.S.C. § 11603(c)(2)(B)); (ii) the return would result in grave risk of physical or psychological harm to the child (Convention, Art. 13b, 51 Fed.Reg. at 10,499; 42 U.S.C. § 11603(e)(2)(A)); (iii) the child's return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms" (Convention, Art. 20, 51 Fed.Reg. at 10,500; 42 U.S.C. § 11603(e)(2)(A)); or (iv) the return proceedings commenced more than one year after the abduction and the child has become settled in the new environment (Convention, Art. 12, 51 Fed.Reg. at 10,-499; 42 U.S.C. § 11603(e)(2)(B)).[7] These affirmative defenses "have been defined as 'narrow'" but a federal court retains discretion and may return a child even in the presence of a defense if the return "would further the aims of the Convention." *Ahumada Cabrera v. Lozano*, 323 F.Supp.2d 1303, 1310 (S.D.Fla.2004), citing *Friedrich*, 78 F.3d at 1067.

### B. Rights of Custody Under the Convention.

■ At the onset, it is important to note that the Convention does not provide for a determination of custody rights or the merits of a custody dispute. Convention, Art. 19, 51 Fed.Reg. at 10,500; *Lops*, 140 F.3d at 936. The Convention's underlying premise is that the child's country of habitual residence is the proper forum with jurisdiction to issue custody orders. *Ahumada Cabrera*, 323 F.Supp.2d at 1310 citing *Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1340 (S.D.Fla.2002). Hence, a court considering an ICARA petition may only address a wrongful removal or retention, but not a custody dispute. *Lops*, 140 F.3d at 936.

The Convention's definition of "right of custody" includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence," clarifying that "rights of access" include only "the right to take a child for a limited period of time to a place other than the child's habitual residence." Convention, Art. 5, 51 Fed.Reg. at 10,498. There is no other specific guidance in distinguishing between the "rights of custody" and the "rights of access." *Lalo v. Malca*, 318 F.Supp.2d 1152, 1154 (S.D.Fla.2004). The Eleventh Circuit warns that in applying the Convention "we must look to the definition of 'rights of custody'" set forth therein "and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms." *Furnes*, 362 F.3d at 711. Furthermore, the Convention indicates rights of custody arise "in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law [of the State in which the child was habitually resident immediately before the removal or retention]." Convention, Art. 3, 51 Fed.Reg. at 10,498. Finally, in interpreting the issue of custody under the Convention, the Eleventh

---

**7.** Affirmative defenses identified herein at (i) and (iv) must be proven by a preponderance of the evidence, while the other two defenses listed require clear and convincing evidence.

42 U.S.C. §§ 11603(e)(2)(A) & (B); *Ahumada Cabrera v. Lozano*, 323 F.Supp.2d 1303, 1310 n. 1 (S.D.Fla.2004), citing *Furnes*, 362 F.3d at 712 n.8.

Circuit explains that "'decisions for the child in personal matters' encompass more than just the child's care," and that "the violation of a *single* custody right suffices to make removal of a child wrongful." *Furnes*, 362 F.3d at 714 & n. 11 (emphasis in original).[8]

## IV. DISCUSSION AND FINDINGS OF FACT

Based on the entire record and relying on applicable law, the undersigned makes the following findings of fact:

*1. Belize Was the Minor Child's Place of Habitual Residence at All Times Applicable to this Decision.*

■ Although neither the Convention nor ICARA defines the term "habitual residence," the Convention's text specifically mentions the time period immediately before an alleged wrongful removal or retention as the relevant time to be considered. Convention, Art. 3, 51 Fed.Reg. at 10,498; *Ruiz v. Tenorio*, 392 F.3d 1247, 1251–53 (11th Cir.2004); *Ahumada Cabrera*, 323 F.Supp.2d at 1310; *Bocquet*, 225 F.Supp.2d at 1343–44. The determination of habitual residence is a mixed question of law and fact, which, besides looking to the place where the child resided just before the removal to another country, also includes, among other considerations, the parents' conduct, their intentions, and any

agreements between them during that time period. *Ruiz*, 392 F.3d at 1251–52 quoting *Mozes v. Mozes*, 239 F.3d 1067, 1071–73 (9th Cir.2001). Of special significance is the absence of shared or settled parental intent unless objective facts point unequivocally to a conclusion that the prior habitual residence was meant to be abandoned. *Bocquet*, 225 F.Supp.2d at 1343–44 quoting *Mozes*, 239 F.3d at 1079–82.

Although in closing argument Respondent's counsel indicated that his client did not dispute that Belize was the minor child's habitual place of residence,[9] the court believes it necessary for purposes of its findings of fact to indicate why a preponderance of the evidence indicates that to be the case as of April 29, 2004, when Respondent removed Adrian from Belize. Petitioner testified that the child lived with him and Respondent in Belize City from the time of his birth until Petitioner and Respondent's separation on December 26, 2003, at which time Respondent moved with Adrian to her parents' house in the Belizean town of Corozal, located between eighty-five and ninety miles from Belize City. 5/4/05 R. at 12, 27, 85. Respondent does not deny those facts. After that separation, Petitioner continued to spend substantial amounts of time at Corozal Town with the minor child, with Respondent's parents initially providing a bedroom in their home for Petitioner's use.[10] 4/21/05

---

**8.** The *Furnes* court went on to state that "Article 3 of the Convention specifies that the removal or retention of a child is wrongful if it is in breach of 'rights of custody attributed to a person ... *either jointly or alone,*'" further noting that decision-making authority on the child's relocation to a foreign country applies under the Convention's Article 5, and that contributing to decisions about the child's upbringing is also indicia of joint parental responsibility/custody arrangements, regardless of which parent has physical custo-

dy of the child. 362 F.3d at 715–716 & 722 n. 18 (emphasis in original).

**9.** As earlier noted, there was no transcript available for the last hearing held on May 24, 2005, at the time of writing this Report and Recommendation. *See supra* note 2 and accompanying text (identifying existing hearing transcripts).

**10.** That arrangement apparently ceased when animosity between Petitioner and Respondent

R. at 33. Respondent does not rebut this testimony either. Petitioner denies that he knew that Respondent planned to leave Belize to marry and to reside permanently with Adrian in the United States.[11] 4/21/05 R. at 42, 51–52. There is no indication that Petitioner acquiesced to the minor child's removal from Belize at any time. Indeed, the record as a whole shows that Petitioner pursued to the fullest the proper avenues under Belizean law to obtain Adrian's legal custody, and that he always intended to keep the minor child in Belize, Petitioner's own country of residence. See, generally 4/21/05 R. at 38–66; Pet'r's Ex. 1, at 4–12, 14, 19, 20–22 (reflecting pursuit of minor child's legal custody, absence of request from protection of Adrian's removal from Belize).

Of significance, too, is that nowhere in the testimony or in the evidentiary documentation from the Belize proceedings is there any indication of Respondent's request to remove Adrian permanently from Belize, or of Petitioner's agreement to such an act. There is also no evidence of any type of agreement between Petitioner and Respondent to have the minor child reside permanently outside Belize with Respondent. Consequently, the court finds that for the purposes of a determination of wrongful removal or retention under the Convention, the child's habitual place of residence was in Belize.

*2. Petitioner Had Rights of Custody Before, During, and After the Proceedings in the Courts of Belize.*

 A brief review of the record is necessary to indicate the conclusion that the preponderance of the evidence supports that at all times pertinent herein Petitioner had rights of custody within the Convention's framework. As earlier noted, prior to Petitioner and Respondent's separation, they lived together with the minor child, with Petitioner participating in the support of, and decision-making for, Adrian. See, e.g., 5/4/05 R. at 58 (reflecting Respondent's admission of Petitioner's financial support of Adrian) and 5/4/05 R. at 207 (describing Petitioner's participation in minor child's school committee). After the separation, Petitioner continued to make decisions for the care of the minor child. See, e.g., 4/21/05 R. at 31, 33–34 and Pet'r's Ex. 2 (showing decision-making power in minor child's health care), and 5/4/05 R. at 14 (containing Respondent's admission of Petitioner's right to object to Adrian's relocation).[12] Sometime after the separation, however, Respondent showed hostility towards Petitioner's right to spend time with the minor child, and she resisted his seeing Adrian. 4/21/05 R. at 39. It was not until the advent of those difficulties that Petitioner instituted proceedings before the Belize Family Court. 4/21/05 R. at 39–40.

After a partial hearing on March 22, 2004, the Belize Family Court initially entered an interim order on April 2, 2004, setting forth weekend dates in April during which Petitioner would have the right to take the minor child with him. Pet'r's Ex. 5. Another partial hearing took place on April 16, 2004, after which the Belize Family Court entered a second interim

led to his seeking court redress to ensure his continuing relationship with the minor child.

**11.** Respondent denies these allegations, and her rebuttal, which the court does not find convincing, is dealt with further on in this discussion.

**12.** It is counterintuitive, as well as illogical, that Respondent would admit that Petitioner had a right to object to the minor child's relocation to Corozal Town (5/4/05 R. at 14), but would not think he had anything to say about her taking Adrian from Belize to live in the United States.

order dated April 28, 2004, effective as of April 16th, revoking the March 22nd interim order.[13] Pet'r's Ex. 6. That April 28th interim order allowed Petitioner to spend April 17th with Adrian[14] and set forth a schedule of dates in May during which Petitioner would spend additional weekends with the minor child. 4/21/05 R. at 57; Pet'r's Ex. 6. The order also appointed a psychologist, Dr. Shirleen Smith, to supervise closely the minor child's behavior "with a view to recommend what is in the best interest of the child." Pet'r's Ex. 6. Further, Petitioner testified that at the April 16, 2004, he stated his intent of seeking Adrian's legal custody through the Belize Family Court proceedings, thereby causing the appointment of Dr. Smith to perform a psychological evaluation.[15] 4/21/05 R. at 48–50. Additionally, the April 28th interim order indicated that the proceedings would adjourn for a final decision on July 16, 2004, "on the advice" of Dr. Smith. *Id.* There is no admonition from the Belize Family Court that Petitioner had to consult with Respondent before reaching decisions in the minor child's best interest during the times in which Adrian was in his physical custody, or at any other time.[16] Thus, a preponderance of the evidence supports that as early as April 16, 2004, Petitioner sought legal custody of Adrian, and that for that reason the Belize Family Court entered a separate order on April 20, 2004, requiring the evaluation of the minor child by psychologist Dr. Shirleen Smith, on May 4, 2004, as well as the intervention of a social worker. 4/21/05 R. at 48; Pet'r's Exs. 7 & 21.[17]

Petitioner testified that Respondent became aware of the May and June 2004 visitation dates during the April 16th hearing, and that she did not object to any of the dates in question, nor did she indicate to the court that she would not be in Belize to comply with the May and June scheduled visits or with the ordered psychological evaluation on May 4th, 4/21/05 R. at 51, 53; *see also* Pet'r's Ex. 14 (reflecting Belize Family Court's willingness to reschedule May 4th evaluation if time inconvenient to Respondent). Respondent's own testimony corroborates Petitioner's representation that at no time did Respondent indicate to him her intent of leaving Belize with Adrian. *See, e.g.,* 5/4/05 R. at 66–69,

---

**13.** This second interim order also provided for the minor child's transfer from Respondent to Petitioner under the supervision of a social worker and a plain-clothes police officer, with the supervision to continue as the need arose. Pet'r's Ex. 6.

**14.** The order provided for a social worker to oversee the transfer of the minor child on that date. Pet'r's Ex. 6. Respondent complied with the April 17th court-ordered transfer. 4/21/05 R. at 58.

**15.** In connection with his pursuit of Adrian's legal custody, on May 4, 2004, Petitioner formally requested discharge of the April 16th order and substitution of it for an order granting him legal custody of Adrian. Pet'r's Ex. 21.

**16.** There is also no indication of concern by Petitioner over Respondent's removal of the

minor child from Belize City, which provides a logical explanation on the silence in the Belize Family Court's record on that issue.

**17.** The Belize Families Children Act at Section 9(1) corroborates the use of any required social services evaluations in connection with reaching a decision in matters relating to the welfare of children, to and including custody proceedings. Resp't's Ex. 11 at 20–21. Moreover, the undersigned notes that in its order resulting from the April 16th hearing, the Family Court showed its concern in adjudicating Adrian's custody by ordering Dr. Smith to supervise closely the minor child's behavior for the purpose of recommending what was in his best interest. Pet'r's Ex. 6.

71–72, 78–79, 118–19 (corroborating Respondent's failure to announce her by then formulated departure plans to the court or to Petitioner through her attorney).

On May 1st, the initial date of the new weekend visitation schedule provided under the April 28th interim order, Petitioner arrived at Respondent's family home in Corozal Town accompanied by a social worker and a police officer to pick up the minor child; according to Respondent's mother, Respondent was in Belize City, and despite three attempts that day at picking up the minor child. Adrian was not transferred to Petitioner. 4/21/05 R. at 53–55. Respondent also did not comply with the court-ordered psychological evaluation scheduled for May 4th. 4/21/05 R. at 55, 57–58. As a result, Petitioner sought the assistance of the Belize Family Court for Respondent's refusal to comply with the terms of the April 28th order, and that Court summoned Respondent to appear on May 20, 2004, at a contempt hearing. *Id.;* Pet'r's Ex. 8. On May 31, 2004, the Belize Family Court summoned Respondent to appear before it on June 6th relative to Petitioner's application for legal custody of the minor child. Pet'r's Ex. 9. Meanwhile, the Belize Family Court sentenced Respondent on June 2, 2004, to three months' imprisonment in accordance with the Belize Criminal Code for contempt of court because she failed to comply with the visitation schedule. Pet'r's Ex. 10. Finally, on March 9, 2005, the Belize Supreme Court granted legal custody of the minor child to Petitioner. Pet'r's Ex. 12.

The text of the Belize Supreme Court's March 9th judgment explains that the Family Court magistrate judge improperly dismissed Petitioner's application for legal custody, specifically noting that the necessary psychological evaluation could not be completed because Respondent *unlawfully* took the child away from the court's jurisdiction, also stating that the Belize magistrate judge based the decision on the *"wrong principle,"* i.e., did not consider the best interest of the child. Pet'r's Ex. 12 at 2 (first emphasis added). It is evident, therefore, that the posture of Belizean law parallels the Convention's approach, i.e., that "the interests of children are of paramount importance in matters relating to custody." Convention, Preamble, 51 Fed.Reg. at 10,498. In other words, failure to consider a minor child's best interest is directly inimical to the essence of the Convention as well as to Belizean custody adjudications.[18]

During the proceeding *sub judice,* this court questioned whether or not the March 9, 2005, Belize Supreme Court award of legal custody applied *nunc pro tunc.* 4/21/05 R. at 16. Neither counsel for Petitioner not for Respondent has provided any legal authority in that regard. A review of the Belize Supreme Court's judgment of March 9, 2005, however, sheds light on that inquiry. The judgment identifies the basis for the grant of custody of the minor child to Petitioner as relying in part on the "incomplete social welfare report" which suggested "that materially it is in the best interest of the child to live with

---

**18.** The Belize Supreme Court specifically indicates in its judgment that an unwed mother's guardianship/custody of a minor child under § 16 of the Families and Children Act is subject to two sections of that Act: § 33 (authorizing court to determine child's parental relationships irrespective of parents' marital status), and § 85 (granting father of child born to a single woman the right to seek guardianship/custody of that child). Resp't's Ex. 11. The Belize Supreme Court granted Petitioner custody of Adrian under § 85 of the Families and Children Act. Pet'r's Ex. 12 at 6.

the father." Pet'r's Ex. 12 at 5. Further, the petition for custody, as well as the eventual grant of custody, was pursuant to Section 85 of the Families and Children Act, Cap. 173, Laws of Belize. Pet'r's Ex. 12 at 1, 3, 6. Section 85 of that Act allows a court sitting in the district of residence of a minor child born to an unmarried woman to grant custody to the child's father. Resp't's Ex. 11. Indeed, the Belize Supreme Court Justice notes that Petitioner applied for legal custody after obtaining resistance of the order allowing access to visit Adrian. Pet'r's Ex. 12 at 3. This commentary by the highest court in Belize corroborates Petitioner's testimony of his pursuit of Adrian's legal custody, which, in turn, is further supported by Petitioner's request to the Belize Family Court to set aside its April 16, 2004, order and to grant him custody of the minor child. Pet'r's Ex. 21. Under the Convention, the law of the child's habitual place of residence establishes whether or not rights of custody existed at the time of removal, and allows another state to take judicial notice of the country of habitual residence's law. Convention, Art. 14, 51 Fed.Reg. at 10,499; *Bocquet*, 225 F.Supp.2d at 1345. As noted above, the Belize Supreme Court found Respondent's removal of Adrian from Belize to be unlawful.

Additionally, the Convention specifically includes caring for the person of the child, and, particularly, the right to determine the child's place of residence, as encompassed within a parent's rights of custody.

Convention, Art. 5a, 50 Fed.Reg. at 10,498. Further, the Convention seeks to protect all the ways in which a parent can exercise rights of custody. Pérez–Viera Report at 446 ¶ 67. Courts have also found that a liberal interpretation of the exercise of custody rights includes a parent's providing financial support and attempting to keep, or to seek, regular contact with a child. *Ahumada Cabrera*, 323 F.Supp.2d at 1311–12 citing *Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1359 (M.D.Fla. 2002) (quoting *Friedrich*, 78 F.3d at 1065). Petitioner's testimony referenced herein clearly reflects his financial support of Adrian, as well as his perseverance at maintaining a close relationship with the minor child and his desire to be involved in all aspects of Adrian's life, to and including making decisions for his well being.[19] Consequently, a preponderance of the evidence supports Petitioner's exercise of rights of custody at all times pertinent to this Report and Recommendation. Added to that, is a preponderance of the evidence denoting that Respondent did not have authority to remove the minor child from his habitual place of residence because of the Belize Supreme Court's finding that Respondent unlawfully removed Adrian from Belize.

As a result, two logical favorable inferences to Petitioner's position follow: (1) that what the Belize Family Court magistrate judge denied on or about August 2, 2004, was Petitioner's custody request retroactive to the proceedings in which Re-

---

19. The undersigned notes that Petitioner's active participation in meaningful aspects of Adrian's life by deciding on his medical care at a time of serious illness, as well as by paying for his private school and serving in a school committee advances a finding that he exercised rights of custody in Belize because the aforesaid activities denote his caring con-

cern about the minor child's health and development. *Gil v. Rodriguez*, 184 F.Supp.2d 1221, 1225 (M.D.Fla.2002). This concept parallels the principles set forth under the Belize Families and Children Act in §§ 3, 6 and 33, and the First Schedule. Resp't's Ex. 11.

spondent participated before her departure from Belize with the minor child, and (2) that as a result of Petitioner's appeal of the denial of his custody request, the Belize Supreme Court's judgment granted Petitioner's application for custody effective as of April 16, 2004. Because there is no question that a determination of custody and its effective date of award lies within the jurisdiction of the Belize court system, this court finds that Petitioner had rights of custody at all times material to this Report and Recommendation, and that the Belize Supreme Court judgment awarding custody to Adrian to Petitioner applied *nunc pro tunc.*

*3. Respondent Wrongfully Removed the Minor Child from Belize, and Wrongfully Retained Him in the United States in Derogation of Petitioner's Rights of Custody.*

■ Based on the foregoing analysis, a preponderance of the evidence supports Respondent's full awareness of on-going proceedings which encompassed adjudication of the minor child's legal custody. A preponderance of the evidence also supports that Respondent unlawfully left the jurisdiction of the Belize courts during the pendency of those proceedings, and that she willingly and knowingly refused to comply with Family Court orders. Essentially, it is Respondent's position, which she identifies as affirmative defenses,[20] that: (1) she had legal custody of the minor child, which granted her the power to determine his place of residence, with Petitioner having only rights of access not protected under the Convention; (2) she gave Petitioner advance notice of her marriage plans and later notified him of her address in Florida thereby attempting to show acquiescence by Petitioner to her departing Belize with the minor child and his remaining in the United States; and (3) the objective of the Convention to return to the *status quo* can no longer be achieved.[21]

The foregoing analysis explains why the Belize Supreme Court's judgment granting legal custody of Adrian to Petitioner belies any testimony that Respondent held sole custody of the minor child. Also, the Belize Family Court's orders do not provide evidence that Petitioner lacked or did not exercise any rights of custody under the Convention. Additionally, there is no evidence of acquiescence by Petitioner to have Adrian removed from Belize.

To start with, the undersigned finds unpersuasive Respondent's testimony that she notified Petitioner of her plans to marry Richard Codd[22] and to leave Belize with Adrian for the purpose of residing permanently with Mr. Codd in the United States. 5/4/05 R. at 12, 20–31, 202–03. It is illogi-

20. Respondent, through her counsel, represented to this court that the issue of domestic violence was not an affirmative defense in these proceedings. 5/4/05 R. at 128–29. Therefore, the undersigned does not address any of the testimony pertaining to that issue.

21. In his closing argument at the May 24, 2005, hearing, Respondent's counsel identified these defenses as being the operative ones. Even though the return to the *status quo* is not a recognized affirmative defense under the Convention, the court will discuss that contention in this Report and Recommendation for the sole purpose of completion in addressing fully all of Respondent's allegations. *See* Convention, Arts. 12 & 13, 51 Fed.Reg. at 10,499, and 42 U.S.C. § 11603 (outlining proper affirmative defenses in Convention proceedings).

22. Respondent married Mr. Codd in Royal Palm Beach, Florida, on May 6, 2004. Resp't's Ex. 10.

cal that Respondent would have notified Petitioner of her plans and that he would not have acted immediately upon that knowledge. In other words, the preponderance of the evidence shows that Petitioner sought protection of his rights of custody under Belizean law as soon as Respondent interfered with those rights, but indicates nothing whatsoever as to his attempting to prevent the minor child's removal from Belize, which is precisely what he is doing in these proceedings. Indeed, it does not follow either that Petitioner would bother to show up on May 1, 2004, to enforce his weekend visitation right with Adrian if he knew that Respondent and the minor child were no longer in Belize. 5/4/05 R. at 216.

Equally, the undersigned does not find persuasive Respondent's explanation of her leaving Belize through Mexico en route to the United States. In particular, Respondent's explanation of the lesser cost of that line of travel is not convincing, since her testimony does not support that the cost of hers and the minor child's bus tickets to Cancún, Mexico, the one way fares for the two of them to Miami, and Respondent's mother's round trip ticket between Corozal Town and Cancún would amount to a significant type of savings, if any. See 5/4/05 R. at 36–88, 100–01.[23] The preponderance of the evidence, however, militates in favor of Respondent's plan to depart Belize unnoticed.[24] The record further supports that inference as a result of Respondent's equivocal testimony that because Respondent was not asked for a letter of permission from Petitioner

to fly with Adrian from Cancún to the United States that such documentation was not required when flying from Belize to Miami, Florida. See 5/4/05 R. at 102–03 (reflecting Respondent's awareness of need of father's permission to fly to United States mainland from Belize, her obtaining that approval in the past); see also 5/4/05 R. at 98, 139, 154–58 (presenting argument, comments on suspiciousness of circuitous route).

Significantly, Richard Codd testified about Respondent's expressing her concern to him over any negative repercussions as a result of her leaving Belize before the conclusion of the Family Court proceedings, 5/4/05 R. at 165–71. In particular, Mr. Codd admitted under oath Respondent's full knowledge of her failure to comply with the Belize Family Court's pending interim order at the time of her departure. Id. at 170. As a matter of fact, the record contains inconsistent and contradictory testimony on the issue of Respondent's legal right to leave Belize with the minor child.

Respondent's testimony that she left Belize after being told by her attorney that she could do so, contradicts her statement that she fired her attorney because she did not trust the attorney's advice. 5/4/05 R. at 36–39, 76–77, 79. Also, the court finds it illogical that a practicing attorney with full knowledge of the facts involved in the Belize Family Court pending case would advise Respondent that there was no problem with her leaving in the midst of those proceedings without adverse results to her.

---

**23.** Additionally, Respondent contradicts herself on who paid the total cost of the tickets. At one point she says her mother, who accompanied her to Cancún, paid her own round trip fare, but then says she (Respondent) paid for everything. 5/4/05 R. at 100–01.

**24.** A court may consider the secreting of a child's whereabouts. See Lops, 140 F.3d at 946 (validating evidentiary consideration of concealment from a parent, the legal authorities).

In that regard, the court takes note that the affidavit of Melissa Balderamos Mahler, Respondent's attorney during the Belize Family Court proceedings,[25] contains no statement addressing in any way that Ms. Mahler provided the advice to which Respondent testified, nor is there any indication whatsoever by the affiant that the Family Court proceedings had concluded.[26] In addition, even though Respondent presented Ms. Mahler's affidavit on the issue of substantive Belizean law, Ms. Mahler does not mention in any way the effect of Respondent's failing to comply with the terms of the Family Court order on delivering Adrian to Petitioner during May and June of 2004, or with the order which required taking the minor child to the Belize Counselling Center on May 4, 2004, for a psychological evaluation. Pet'r's Exs. 6 & 7.

Moreover, Respondent's testimony that a Belizean magistrate judge advised her the same as Ms. Mahler that there was no problem with her leaving the country with Adrian when she did, is denied by that magistrate judge herself. *Compare* 5/4/04 R. at 76–77 (reflecting Respondent's testimony of magistrate judge's advice) *with* Pet'r's Ex. 25 (containing Belizean magistrate judge's unequivocal denial of knowing Respondent, advising her on custody proceedings). In fact, not only does the magistrate judge's statement under oath belie Respondent's testimony, but that testimony flies in the face of the Belize Supreme Court's finding that Respondent removed Adrian unlawfully pending adjudication of the minor child's custody. Further, this court finds that Respondent's sentence under the Belize criminal code to three months' imprisonment resulting from contempt of a Family Court order speaks for itself, i.e., it explains the result of non compliance with a Family Court order and also provides a clear depiction of Respondent's disregard for the law and intent to take matters into her own hands. Pet'r's Ex. 12 at 3. Overall, Respondent's testimony on her right to depart Belize with the minor child seriously erodes her credibility, while simultaneously bringing to the fore, and enhancing, Petitioner's vigorous pursuit of his rights of custody, including an adjudication of Adrian's legal custody, as well as Petitioner's respect for, and recognition of the need to abide by, the Belizean legal process.

Additionally, the undersigned interprets the ruling of the Belize Supreme Court as being tantamount to the existence of a *ne exeat* clause because the judgment explicitly states that Respondent unlawfully left Belize. *Furnes*, 362 F.3d at 715. Said differently, the judgment from the Belize Supreme Court identifies Respondent's departure with the minor child before the conclusion of the Family Court proceedings as being unauthorized under Belizean law. That is precisely the meaning of a *ne exeat* clause. *Id.* Therefore, the undersigned finds that Respondent did not have legal authority to remove the minor child from Belize on April 29, 2004. Hence, that removal was wrongful under the Conven-

---

**25.** This affidavit is attached to Respondent's Second Submission of Proof of Substantive Law of Belize (D.E.# 37).

**26.** Ms. Mahler's affidavit acknowledges that the Belize Family Court order effective April 16, 2004, was an interim one. That order, however, adjourned the proceedings until July 16, 2004, at which time the Family Court planned to make a decision on the best interest of the minor child based on the report by psychologist Dr. Shirleen Smith. Pet'r's Ex. 6.

tion's framework. For the same reason, Respondent's retention of Adrian in the United States as of April 30, 2004, date was wrongful, too.

■ On the allegation of Petitioner's agreement to Respondent's removal of Adrian from Belize, under the Convention, subjective acquiescence can be shown by a preponderance of the evidence pointing to (1) a formal act or statement (e.g., testimony in a judicial proceeding); (2) a convincing written statement; or (3) a persuasive acquiescent attitude over a significant period of time. Convention, Art. 13a; *Mendez Lynch,* 220 F.Supp.2d at 1361 quoting *Friedrich,* 78 F.3d at 1070 and *Pesin,* 77 F.Supp.2d at 1288–89. Here, the record contains no subjective indication that Petitioner acquiesced to the minor child's removal from Belize or his retention in a foreign country.

■ The court accepted into evidence a letter dated May 12, 2004, from Respondent to Petitioner. Resp't's Ex. 3. The text of the letter indicates a return address in Wellington, Florida, and advises Petitioner that Respondent is married, and that he is "welcome to come and see" Adrian. *Id.* Respondent testified that she did not mail the letter, but instead sent it for mailing in Belize to Petitioner with a friend of Respondent's who was traveling to Belize a few days after the date reflected on the letter, 5/4/05 R. at 113–18. Petitioner denies ever receiving the letter, 5/4/05 R. at 201–02. There is no objective evidence of delivery of the letter nor of any action on the part of Petitioner to act on its content. Also a review of that May 12th letter shows that the notarization below Respondent's signature does not comply with Florida's statutory requirements of a *jurat* and the notary's indication of

form of identification of the individual signing. F.S. §§ 117.05(4) & (13).

Additionally, and of marked significance, is the fact that when she moved from the Wellington, Florida, address approximately three months later, Respondent admitted that she did not attempt to notify Petitioner of her new location to update him about where to locate the minor child. 5/4/04 R. at 115. Moreover, not only was there no attempt to notify Petitioner of the new address when Respondent moved to where she currently lives with Mr. Codd, but there was no explanation to the court's comment during the May 24, 2005, hearing about the availability of facsimile communication to provide Petitioner with information on the minor child's whereabouts instead of using what would appear to be in today's electronic age an unnecessarily complicated, circuitous, and objectively difficult to prove form of delivery of a letter. Accordingly, the court not only finds Respondent's May 12, 2004, letter to be irregular on its face as a document of proof, but gives it no probatory weight because the inconsistency in not notifying Petitioner of the new address denies a believable good faith effort by Respondent of letting Petitioner know of Adrian's whereabouts. Hence, Respondent's letter of May 12, 2004, cannot serve as proof of Petitioner's acquiescence to Adrian's removal from Belize and his retention in the United States. Thus, Respondent's attempt to show that Petitioner did not act when she notified him by letter of her address in Florida, and her extension of an invitation to visit with the minor child falls extremely short of a preponderance of the evidence to support acquiescence.

Respondent also has not presented any credible evidence that supports her contention that she advised Petitioner in Jan-

uary of 2004 of her relationship with Mr. Codd, or that she told Petitioner on February 29, 2004, of her intention to leave Belize for the United States and of her plan to marry Mr. Codd. 4/21/05 R. at 114, 121, 123. As earlier noted, it stands to reason that had Respondent made those representations to Petitioner, he would have taken the proper legal steps to prevent her departure, the same as he did afterwards to ensure the continuing ability to enforce his rights of custody.

There is also no objective proof of Petitioner's acquiescence to Adrian's leaving Belize and residing in the United States either. The record contains more than a preponderance of the evidence that at all times Petitioner exercised, or sought to exercise, his rights of custody, and that he never wavered from his position of seeking a protection of those rights. *Mendez Lynch*, 220 F.Supp.2d at 1361. Petitioner's relentless pursuit of exercising his rights of custody through legal channels both in Belize and in the United States points to a desire to keep his child in Belize.[27] The right to determine where a child lives permanently is, among many others, a right of custody under the Convention, since it endows a parent "with significant decision-making authority over the child's care." Convention, Art. 5, 51 Fed.Reg. at 10,498; *Furnes*, 362 F.3d at 715–16.

The court must once more reiterate that Respondent's lack of a legal right to remove Adrian and/or retain the minor child outside Belize during the pendency of the Family Court proceedings, supports the

finding that Petitioner had rights of custody under Belizean law as encompassed under the Convention's scheme. *Furnes*, 362 F.3d at 714. The *Furnes* court noted that under Article 5 of the Convention, "rights of custody" can include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* The preponderance of the evidence favors the view that Petitioner exercised no less than shared parental responsibility in the care and custody of the minor child while Petitioner and Respondent lived together, as well as after they separated. For example, Petitioner paid for the school that the minor child attended, and also took him there and picked him up; he was concerned for Adrian's well being and his development, and there is no convincing testimony to contradict his sharing in the making of decisions favoring Adrian's best interests. 4/21/05 R. at 107–10. The Convention's purpose is to protect all ways in which a parent can exercise rights of custody and, as a result, the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Furnes*, 362 F.3d at 716 n. 12 citing Pérez–Viera Report at 445, 447 ¶¶ 67, 71.

The record shows that after the separation Petitioner continued to participate in the decision-making process for the minor child's health care. Specifically, there is no documented opposition to Petitioner's choosing to take Adrian to his regular pediatrician in Belize City in February of 2004 when Petitioner was not satisfied

---

**27.** The undersigned takes notice that case law in the Southern District of Florida supports the proposition that a seeking of custody undertaken even after removal of a child from the habitual place of residence is a valid indicator of a parent's disagreement to the removal of the child to a different country. *Pesin v. Osorio Rodriguez,* 77 F.Supp.2d 1277, 1289–90 (S.D.Fla.1999).

with the minor child's medical care in Corozal Town. The record shows that Petitioner's decision to act in the minor child's best interest in February of 2004 (a date after Respondent and Petitioner's separation) led to the diagnosis, treatment, and cure of Adrian's ameba infection. 4/21/05 R. at 33–35. The court finds Petitioner's proactive move in the minor child's best interest amounts to a right of custody under the Convention. As indicated by the *Furnes* court, "it is crucial to note that the violation of a *single* custody right suffices to make removal of a child wrongful. That is, a parent need not have 'custody' of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody." *Furnes*, 362 F.3d at 714 (emphasis in original). Moreover, the Convention makes it clear that removing or retaining a child is wrongful if it breaches "rights of custody attributed to a person … *either jointly or alone.*" Convention, Art. 3a, 51 Fed.Reg. at 10,498; *Furnes* 362 F.3d at 715 (emphasis added).

◼ As to the allegation of inability to return to the *status quo,* the record does not support it either. It is true that the Convention seeks to attain its objective by restoring the *status quo.* Pérez–Viera Report at 429–30 ¶ 16. That restoration refers to a *factual status quo ante* and "is not contingent on the existence of a custody decree." *See* United States Department of State Legal Analysis of Convention (Legal Analysis), 51 Fed.Reg. at 10,505 (explaining handling of pre-decree removals or retentions) (emphasis added). The way to achieve the *status quo ante* is to defer to the resolution of all custody issues by competent courts in the child's habitual place of residence. Pérez–Viera

Report at 429 ¶ 16; Legal Analysis, 51 Fed.Reg. at 10,505. The concept of the return of the child under Article 1b of the Convention in order to protect rights of custody and of access has a "teleological connection" to "the desire to re-establish a situation unilaterally and forcibly altered by the abductor." Pérez–Viera Report at 429–39 ¶ 17. There is no requirement that a parent "obtain a custody order in the State of the child's habitual residence as a prerequisite to invoking the Convention's return provisions." Legal Analysis, 51 Fed.Reg. at 10,506. Consequently, the Convention's objective of returning a minor child to the jurisdiction of a competent court to determine all custody matters includes the essential element of restoration of "the pre-abduction status quo," to protect the non abducting parent's legal rights and to deter parents from "crossing borders in search of a more sympathetic court." *Furnes,* 362 F.3d at 710 citing *Lops,* 140 F.3d at 936 (quoting *Friedrich,* 78 F.3d at 1064; *Mendez Lynch,* 220 F.Supp.2d at 1356–57) citing Convention, Art. 1, *Bekier v. Bekier,* 248 F.3d 1051, 1053 (11th Cir. 2001), and *Lops,* 140 F.3d at 935–36 (quoting *Friedrich,* 78 F.3d at 1064).

Here, the only party affected by returning to the *status quo ante* is Respondent because of her own willful decision to leave Belize and the consequences of her act. Because of this court's finding that Respondent's removal of Adrian from Belize and his retention in the United States was wrongful and the fact that a return to the *status quo* is not an affirmative defense under the Convention, Respondent's argument must fail. Hence, a restoration of the *status quo* as advanced under the Convention requires the return of Adrian

to Belize.[28]

In conjunction with the discussion on Respondent's affirmative defenses, however, this court finds it necessary to address separately the issue of Respondent's running away from the law in Belize. Any decision on these proceedings is bound by the Eleventh Circuit's application of the "fugitive disentitlement doctrine" (allowing dismissal of the appeal of a party who is a fugitive from justice) both to civil and criminal matters, which has even been invoked in a case under the Convention. *Pesin v. Rodriguez*, 244 F.3d 1250, 1251–52 (11th Cir.2001). Here, the Belize Supreme Court specifically states that Respondent is a convicted fugitive under that country's legal system. Pet'r's Ex. 12 at 3. Consequently, any affirmative defense raised by Respondent herein fails and must be dismissed. *Pesin*, 244 F.3d at 1251–52.

## CONCLUSION

The foregoing discussion supports the facts that: (1) Petitioner followed the proper, orderly process in Belize to obtain legal custody of the minor child; (2) Respondent flaunted the court's authority and left the jurisdiction unlawfully despite her knowledge of the pending custody proceedings, thereby showing her disregard and disrespect for the minor child's rights as well as her lack of desire to protect Adrian from conflicts between the parties; (3) Respondent is a convicted fugitive from the law and no affirmative defense she may plead can stand; (4) Petitioner has legal custody of the minor child; and (5)

the Belize Supreme Court based its decision on Adrian's best interest. Therefore, the proper remedy under the Convention and ICARA is to return the minor child to Belize under the custody of Petitioner for further adjudication before the proper tribunals in Belize of any and all issues that Petitioner and Respondent seek to address in the context of the minor child's best interest. It is, therefore

**RECOMMENDED** that Petitioner's Petition under the Convention be **GRANTED** and that Respondent's affirmative defenses, along with the dismissal request of Petitioner's action be **DENIED**. The undersigned also recommends that the district court retain jurisdiction to assess any attorneys' fees and costs that may be appropriate pursuant to 42 U.S.C. § 11607. In that regard, the parties are hereby **ORDERED** to confer in an attempt to resolve the issue of attorneys' fees and costs. If after fifteen (15) days from the date of any order which might be entered by the district court affirming this Report and Recommendation the parties are unable to reach agreement as to entitlement and amount of such fees and costs, then the undersigned recommends that Petitioner be granted ten (10) days within which to file a motion accompanied by the required memorandum of law in accordance with the local rules of this court, as well as any other evidence deemed appropriate, such as a detailed affidavit, time sheets, and receipts, evidencing the fees and costs incurred. Additionally, it is recommended that Respondent be granted ten (10) days from the date of receipt of Petitioner's motion within which to file her

---

**28.** It is true that Respondent faces serving a three months' jail sentence if she returns to Belize. That situation, however, is a direct result of Respondent's failure to comply with the orders of the Belize Family Court, which occurred when she engaged in self-help by leaving Belize unlawfully. As a result, whatever predicament she faces in Belize is of her own making.

response in opposition to the motion, and that Petitioner be allowed five (5) days from the date of receipt of Respondent's response to file any desired reply.

**IT IS FURTHER RECOMMENDED** that the order granting Petitioner's Petition provide that the United States Marshals' Service be directed to ensure within ten (10) days of the date of the district court order that Petitioner comply with the order, and that the Marshals' Service accompany Petitioner and the minor child to the Miami International Airport for their departure to Belize. The undersigned further recommends that the district court's order notify all other federal, state, and local law enforcement officers that Petitioner has the authority and the lawful custody to remove Adrian from the United States of America and to return with him to Belize. Finally, it is also recommended that the district court order require Petitioner and Respondent to arrange through their respective counsel for the return of all original travel documentation to Petitioner, Respondent, and the minor child.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections to it, if any, with the Honorable Daniel T.K. Hurley, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. *Resolution Trust Corp. v. Hallmark Builders*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749 (11th Cir.1988).

June 2, 2005.